UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

MARK ISSAC SNARR,                      )
               Petitioner              )        Case No. 1:13-CV-724
   v.                                 )        Criminal No. 1:09-CR-00015
                         )
UNITED STATES OF AMERICA                )        Judge Marcia A. Crone
             Respondent              )

---

**PETITIONERS' JOINT MOTION AND MEMORANDUM
IN SUPPORT OF MOTION FOR RECUSAL**

---

Mr. Snarr and Mr. Garcia respectfully jointly move for recusal of Judge Crone and for assignment of the cause to a judge from outside the Eastern District of Texas and in support provide the following Memorandum.

## I.    Introduction

This request for recusal arises from a contested claim that the jury venire in Mr. Snarr and Mr. Garcia's joint capital case was unlawfully assembled in violation of the Jury Selection and Service Act (JSSA), the Eastern District Jury Plan (Jury Plan) and the Fair Cross-Section Guarantee. Judge Crone should be recused from presiding over this claim given her intimate involvement in the assembly of the venire and the need for the presiding judge on the claim to make factual determinations and credibility assessments regarding the actions and intentions of court staff.

Mr. Snarr did not bring this jury claim prior to trial and seeks to show cause for this default. Mr. Snarr has alleged that cause is shown where he was misled by the Court through its staff, who affirmatively, but inaccurately, assured the defense on the record that jury selection was being conducted randomly and in accordance with the Jury Plan. In reality, the selection was conducted

1

in violation of the Plan and the JSSA and employed a non-random method of selection that produced a non-representative wheel, venire, and jury. The government responds that in order to show cause for his default, Mr. Snarr must prove that the Court or its staff *intentionally* misled the defense when making these misrepresentations. (ECF No. 134 at 32).[1]

In the Eastern District of Texas, the Jury Plan specifically provides for the district judge to supervise jury selection and Judge Crone worked directly with court staff in this capacity during the assembling of the venire and presented the jury coordinator to the parties to represent on the record that the jury selection was being conducted randomly and in accordance with the Jury Plan.

Recusal is mandated here where a reasonable and objective person knowing all of the facts would harbor doubts concerning Judge Crone's impartiality, and where Judge Crone has personal knowledge of disputed evidentiary facts and is likely to be a material witness.

Further, given the involvement of long-time Eastern District staff, such as the then and now Jury Coordinator, Beth Harper, and Judge Crone herself, it is submitted that this is an appropriate case for assignment to a judge outside the district.

## II.   Procedural history and the facts that might reasonably cause an objective observer to question Judge Crone's impartiality

### A.   Mr. Snarr has brought a meritorious claim regarding the unlawful assembly of his jury venire and consideration of that claim necessarily revolves around the actions and statements of the Clerk of Court and other staff of the Eastern District and, potentially, Judge Crone and Chief Judge Gilstrap

Mr. Snarr has a pending motion for relief under 28 U.S.C § 2255 in respect of the conviction and death sentence imposed in May 2010 in case 1:09-CR-00015 following a trial presided over by Judge Crone in the Eastern District of Texas. (ECF No. 123 at 9).

---

[1] In reply, Mr. Snarr has made clear that his assertion of cause and prejudice does not depend upon a showing that Ms. Harper intentionally lied, only that she misrepresented the facts. A misrepresentation may be innocent, negligent or intentional but, as discussed in Mr. Snarr's Reply (ECF No. 144 at 29–30), it is the misrepresentation, not its intent, which supplies cause.

2

In his Claim I, Mr. Snarr has alleged violations of the Fair Cross-Section Guarantee, the JSSA and the Jury Plan. In particular, Mr. Snarr has alleged that the Master Wheel from which his venire was drawn was illegally selected using an unauthorized Special Wheel and a non-random method of selection, and that this method resulted in a wheel, venire, and jury that were unrepresentative of the Beaumont population, excluding people of color and younger people from service. Further, that the defense was misled by court staff prior to trial, and then later during habeas proceedings, as to the true manner in which the venire was being assembled.

Mr. Snarr has alleged that:

- The 2009 Jury Plan (Plan for the Random Selection of Jurors U.S. District Court for the Eastern District of Texas as amended March 26, 2009) controlled the selection of the jury venire in this case.[2]

- Under the auspices of the 2009 Jury Plan, a Master Jury Wheel (the "2010 Master Wheel") was developed in 2009, including 61,483 names, but, despite the terms of the jury plan permitting the creation of only one Master Jury Wheel, this was not the Wheel used for jury selection in the present case.[3]

- Contrary to the Jury Plan and unknown to the defense, the 2010 Master Wheel was not assembled using the increment method in order to provide for a random selection. Instead, the Court, its staff, and contractor assembled the 2010 Master Wheel by sorting the voter rolls for each county in ascending order of state voter ID number and then selecting the first 61,483 names in order of voter ID number. None of the remaining 237,069 prospective jurors in the district with higher voter

---

[2] Attachment 1 – Plan for the Random Selection of Jurors, U.S. District Court for the Eastern District of Texas, as amended March 26, 2009 (Jury Plan).
[3] Attachment 2 – FILED UNDER SEAL.

ID numbers were selected, nor had any possibility of being selected for service using this improper method of selection.[4]

- Since voter ID numbers are assigned sequentially and chronologically, this is obviously not a random method of selection, and it produced a wheel that was significantly unrepresentative as to race, ethnicity, and age.[5]

- On October 30, 2009, the Court conducted a status conference and presented Beaumont Division Jury Coordinator, Beth Harper, to apprise the parties of how the wheel and venire were being selected in Mr. Snarr's case. Ms. Harper did not disclose that a special selection was being used or that a non-random method of selection was being employed that favored older, whiter prospective jurors. Instead, Ms. Harper assured the defense that jury selection was being conducted according to the procedure provided in the jury plan, including by the random selection of names from the voter roll.[6] This information was false and misleading.

- In addition to this status hearing, the Court engaged in other, off the record, communication with counsel regarding the process and progress of assembling the venire and it was apparent that Judge Crone was receiving information from Ms. Harper regarding the jury selection process in the absence of the parties. Judge Crone clearly worked hard on the jury selection and was actively engaged in the process both on and off the record, and both in the presence of and in the absence of defense counsel.

---

[4] Attachment 2 – FILED UNDER SEAL.
[5] Attachment 2 – FILED UNDER SEAL.
[6] Attachment 3 – Transcript of Proceedings, October 30, 2009.

- In November 2009, contrary to the Jury Plan and unknown to the defense, the Court and its staff selected a special wheel for Mr. Snarr's trial (the "2009 Beaumont Special Selection"), rather than selecting prospective jurors from the Beaumont Division's Master Wheel as required by the Jury Plan.[7]

- Like the 2010 Master Wheel, this 2009 Beaumont Special Selection was not assembled using the increment method but was, once again, selected by ordering prospective jurors by county and then sequentially by voter ID number and then selecting the first 2,200 names in ascending order of voter ID (starting after those already selected for the 2010 Master Wheel). This is not a random method of selection and failed to ensure that the mathematical odds of any single name being picked was equal or that the possibility of human discretion was eliminated.[8]

- The method of selection produced a wheel that significantly underrepresented jurors of color—especially Hispanic jurors—and younger jurors and was stacked with married couples and domestic partners. The method of selection excluded from any possibility of service those assigned higher, more recently issued, voter ID numbers, limiting the possibility of service to those with the lowest available, earliest assigned, voter ID numbers.[9]

- The Court ordered that the defense only be provided a heavily redacted jury venire list, providing only the name, city, and state for each prospective juror, thus greatly

---

[7] Attachment 4 – Email of Eastern District of Texas Operations Manager, Terri Splawn, November 3, 2020 (Splawn Email); Attachment 2 – FILED UNDER SEAL.
[8] Attachment 2 – FILED UNDER SEAL.
[9] Attachment 2 – FILED UNDER SEAL.

limiting the ability of the defense to observe the anomalies in the jury selection. This redacted list was provided to the defense on March 29, 2010.[10]

- A venire of 308 people was drawn from the illegitimate and non-random 2009 Beaumont Special Selection. The venire significantly underrepresented jurors of color, most especially Hispanic jurors. It also virtually eliminated any prospective juror under the age of forty. Unsurprisingly, the jury itself significantly underrepresented jurors of color. There was only one Black juror in a jury eligible community that is almost a quarter Black, while Hispanic representation was cut by more than two-thirds in the venire compared to the jury eligible population and was entirely eliminated on the jury itself. No juror under the age of forty-four served.[11] More specifically:

  o When the voter registration list in the Eastern District is sorted in order of voter ID number, the population at the front of the list (i.e., the lower voter ID numbers) is much older and much whiter than the population of the remainder of the voter list, which has become younger and more racially diverse over time. Selecting jurors from the front of this list is guaranteed to produce an unrepresentative jury.

  o Because of the ordering of the lists and the non-random selection, more than 15% of the 2009 Beaumont Special Selection shared the same last name and street address as another person on the list, as opposed to the less than 0.5% of such occurrences as might be expected in a random selection.

---

[10] Attachment 5 – Transcript of Proceedings, March 29, 2010 (extract).
[11] Attachment 2 – FILED UNDER SEAL.

o   Because of the ordering of the lists and the non-random selection, the average age of the jurors on the 2009 Beaumont Special Selection was 13 years older than that of the rest of the voter list and produced a gross underrepresentation of younger jurors in the 2009 Beaumont Special Selection, the venire and the eventual jury as shown in the table below:

| Ages in 2009 | 2010 Voter List | 2009 Special Selection | Venire of 308 | Trial jury |
|---|---|---|---|---|
| 18–29 | 17.50% | 1.78% | 0.32% | 0.00% |
| 30–39 | 15.35% | 4.34% | 3.90% | 0.00% |
| 40–69 | 51.65% | 71.48% | 95.78% | 100.00% |
| 70+ | 15.50% | 22.39% | 0.00% | 0.00% |
| Total | 100.00 | 100.00% | 100.00% | 100.00% |

o   Because of the ordering of the lists and the non-random selection, Black jurors were underrepresented on the venire by 11.02%.

o   Because of the ordering of the lists and the non-random selection, Hispanic jurors were underrepresented on the venire by 70.12%. This is an underrepresentation of more than three standard deviations and is statistically significant.

• In May 2010, Mr. Snarr was tried by a jury improperly skewed to be older and whiter than the community from which it was drawn and was convicted and sentenced to death.

• On June 20, 2014, habeas counsel[12] sent letters to the Eastern District of Texas Clerk of Court, David Maland, and Beaumont Division Jury Coordinator, Beth

---

[12] Requests for information were sent at various times by Mr. Snarr's counsel and Mr. Garcia's counsel, on behalf of both petitioners.

Harper, requesting various documents relevant to the selection of the jury wheel and petit jury in the present proceeding. Believing that the venire had been selected according to the Jury Plan, counsel sought, *inter alia*, the 2010 Master Wheel, without asking for the data from any special wheels. Neither Mr. Maland nor Ms. Harper corrected counsel's misapprehension by advising that a Special Wheel was used to select capital juries in the district, even though the letter requesting records stated that the request related to capital defendants who had been tried in the Beaumont Division.

- On August 4, 2014, Mr. Maland replied[13] attaching various jury data but not including any data in relation to the 2009 Beaumont Special Selection nor revealing its existence. Despite specific request and without explanation, Mr. Maland did not supply AO-12 demographic data in relation to the 2010 Master Wheel, though he did provide such data in relation to other Master Wheels. The demographic data from the 2010 Master Wheel would have revealed that the Master Wheel did not represent a fair cross-section. In 2020, as a result of further requests, the Court finally provided the demographic data from the 2010 Master Wheel.[14]

- Attached to Mr. Maland's August 4, 2014, was a document from Michael Sutera at Sutera Data Systems, the data-processing firm contracted by the Court to help facilitate venire selection.[15] This document claimed that the method of selection for the 2006 and 2008 Master Wheels was the increment method and that starting in

---

[13] Attachment 6 – Letter of Clerk Maland regarding jury records, August 4, 2014 (Maland Letter 2014) (attached jury records, omitted here, are included as exhibits in Mr. Snarr's Amended § 2255 Motion).
[14] Attachment 4 – Splawn email.
[15] Attachment 6 – Maland Letter 2014.

2010, the purely random method was used. This information, generated by a contractor for the Court and supplied by the court staff is clearly false and misleading. The selection for the 2010 Master Wheel and the 2009 Beaumont Special Selection used in Mr. Snarr and Mr. Garcia's trial was non-random and did not involve either the increment method or the random number method.[16] Mr. Sutera also failed to disclose that the 2009 Beaumont Special Selection had been drawn for Mr. Snarr and Mr. Garcia's case. The response from Mr. Maland and the attachment from Mr. Sutera failed to include, despite request, the certificate required by the Jury Plan attesting to and describing the jury selection method actually employed.

- The true nature of the jury selection method employed by court staff for the 2010 Master Wheel was discovered by the defense serendipitously and only after an extraordinary effort to reconstruct the data set from millions of rows of data across multiple data sets. However, unaware of the existence of the 2009 Beaumont Special Selection, the defense still could not reconstruct or understand what had happened in this case.

- On December 19, 2019, habeas counsel wrote to jury coordinator, Beth Harper, identifying the ranges of participant numbers in the Master Wheels previously provided, pointing out that they were not contiguous and that jurors from the venire in the present proceeding had been assigned participant numbers outside of the ranges shown in the provided Master Wheels.[17]

---

[16] Attachment 2 – FILED UNDER SEAL.
[17] Attachment 7 – Email correspondence between Jason Hawkins and Beth Harper, December 2019 to January 2020.

- On January 15, 2020, Ms. Harper replied stating, "The jury wheel for the Snarr/Garcia case was from 11/10/2009 participant numbers 1746379 – 1748578."[18] This was the first time that the Court or its staff advised that the jury in the present proceeding was not selected from one of the Master Wheels authorized by the Jury Plan but from some other Wheel. A copy of the 2009 Beaumont Special Selection in machine readable format was provided to counsel shortly thereafter.

- On June 30, 2020, counsel wrote once again to Ms. Harper asking a series of questions, requesting data, and requesting an opportunity to discuss the jury selection in the present proceeding. In that correspondence, counsel laid out the concern that it appeared that a special master wheel had been used in this case and selected in a non-random fashion in ascending order of voter ID number.[19]

- On November 3, 2020, the Operations Manager for Eastern District of Texas, Terri Splawn, responded, providing some additional data and a limited response to the queries propounded by counsel, but declining to respond to most of counsel's queries.[20] The response declared for the first time that special wheels are used by the Eastern District in capital cases but also asserted that the separate capital wheels used the same random selection procedures as the authorized Master Wheels and comply with federal rules. As described above, this is false and misleading: the 2009 Beaumont Special Selection in this case was most certainly not drawn using

---

[18] Attachment 7 – Email correspondence between Jason Hawkins and Beth Harper, December 2019 to January 2020.

[19] Attachment 8 – Email and letter of Rob Lee to Beth Harper and David Maland.

[20] Attachment 4 – Splawn email.

the random procedure authorized for Master Wheels and was not drawn in compliance with federal rules.

- Consistent with the Court's role in supervising jury selection, the Jury Plan provides that the certificates describing the method of random selection are to be provided to the Chief Judge. In September 2020, habeas counsel's staff contacted the chambers of Chief Judge Gilstrap, seeking access to the relevant certificates but the Chief Judge's chambers did not produce or indicate that they had possession of any certificates and instead referred the request to Beth Harper.[21] Habeas counsel's staff similarly contacted Michael Sutera seeking a copy of the relevant certificates and he advised that while it was normal procedure to supply signed certificates to the Court, he did not have a copy of the requested certificate and referred counsel back to the Clerk of Court's office. Mr. Sutera initially advised that while he did not have copies of the certificates on file, he could reproduce the certificates if needed. Later Mr. Sutera stated that he did not recall saying that he could reproduce the certificates and that he did not have records from the 2006 to 2012 period, only from 2013 onwards.[22] No certificates were ever produced.

**B.    The Court and its staff are central subjects of the substantive claim and the cause and prejudice enquiry**

As the 2009 Jury Plan expounds, the Clerk of Court is to manage the jury selection process under the control of the judges of the district.[23]

The Clerk of Court and his deputies are employees of the judges of the Eastern District of Texas and perform their duties as assigned and under the supervision of the judges of the Eastern

---

[21] Attachment 9 – Declaration of Julia Chung.
[22] Attachment 9 – Declaration of Julia Chung.
[23] Attachment 1 – Jury Plan.

District. 28 U.S.C. §§ 751, 956. The Clerk is directly appointed by the judges of the court and his

appointments of deputies are subject to the approval of the judges of the court. 28 U.S.C. § 751.

The Administrative Offices of the U.S. Courts describe the relationship between the Clerk of Court

and the judges as follows:

> Day-to-day responsibility for judicial administration rests with each individual court. By statute and administrative practice, each court appoints support staff, supervises spending, and manages court records.
>
> The chief judge of each court oversees day-to-day court administration, while important policy decisions are made by judges of a court working together. **The clerk of court is the executive hired by the judges of the court to carry out the court's administrative functions. The clerk manages the court's non-judicial functions according to policies set by the court and reports directly to the court through the chief judge.** Among a clerk's many functions are:
>
> - Maintaining court records and dockets
> - Managing court information technology systems
> - Paying all fees, fines, costs, and other monies collected into the U.S. Treasury
> - **Administering the court's jury system**
> - Providing interpreters and court reporters
> - Sending official court notices and summonses
> - Providing courtroom support services[24]

Thus, the "Clerk's Office" is a group of employees of the judges of the Eastern District,

working under the supervision of those judges and performing non-judicial duties assigned to them

by those judges, including administering the Court's jury system.

The Operations Manager is also an employee of the Court and Sutera Data Systems is a

contractor with the Court, acting under the supervision of the Court and its staff. Obviously, the

Chief Judge and Judge Crone are members of the Court.

---

[24] https://www.uscourts.gov/about-federal-courts/judicial-administration (last visited January 25, 2023) (emphasis added).

As a result of the nature of the claim, the allegation of cause and prejudice and the government's argument that intentional misrepresentation must be proven, the actions and intent of court staff and Judge Crone are subjects of the substantive claim and the cause and prejudice enquiry.

In resolving the relevant claims in the present proceeding, the judge presiding over Mr. Snarr's Amended § 2255 motion is going to have to address at least four major points of decision-making:

- whether to permit discovery;
- whether to allow an evidentiary hearing;
- the cause and prejudice test; and,
- the substantive claim.

In order to show cause and prejudice, Mr. Snarr must make "a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Mr. Snarr has specifically alleged that cause is shown here where court officials concealed the factual basis of the claim or the claim was not reasonably available. The government has argued that Mr. Snarr has failed to show that Ms. Harper deliberately misled the defense as to the method of jury selection. So, both the factual accuracy of the representations of the Court and its staff and the intent behind them have been placed in issue by the government.

The resolution of this aspect of the cause and prejudice question will involve a fact-intensive enquiry and Mr. Snarr will certainly be seeking discovery both in the form of production of documents but also through interrogatories or depositions of relevant court officers. The judge presiding over the habeas motion will be required to determine whether to permit such discovery.

Similarly, Mr. Snarr will certainly seek an evidentiary hearing on the cause and prejudice question, particularly given the government's opposition on this point. The presiding judge will need to decide whether to allow an evidentiary hearing.

In resolving the cause and prejudice question at an evidentiary hearing, or even on the papers, the presiding judge will be required to make factual and credibility determinations about court staff and the processes of the Court itself.

Once cause is established, whether as a matter of establishing prejudice or resolving the substantive habeas claim, additional enquiry and fact-finding as to the actual method of jury selection used and its effect on the wheels and venire will need to be undertaken. This too will involve an additional need for discovery and evidentiary hearings (to the extent the subject matter has not already been addressed in the cause enquiry).

Ultimately, the presiding judge will be required to make factual determinations, credibility determinations, and legal holdings as to whether the United States District Court for the Eastern District of Texas and its staff violated the Jury Selection and Service Act and the Jury Plan and whether relief should be granted because of the Court's failure to select a jury in compliance with the Act or the Fair Cross-section Guarantee. The Court and its personnel are front and center in the resolution of the issues of cause and prejudice and the substantive claims and the interests of the Court and its staff are directly implicated by the questions of whether to permit discovery and evidentiary hearings, as well as the resolution of the substantive and procedural issues.

III.    **Recusal is mandated in this cause under the statutory and constitutional standards**

A.    **Recusal is required under the statutory standard contained in 28 U.S.C. §§455(a), (b)(1), and (b)(5)(iv)**

1)    **28 U.S.C. § 455 sets out the statutory standard for mandatory recusal**

The recusal standard set out in the statute is broad in scope, requiring an objective assessment of any possible appearance of partiality, because "justice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. 133, 136 (1955). The section reads in relevant part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

14

(b) He shall also disqualify himself in the following circumstances:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> \* \* \* \*

> (4) He knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> \* \* \* \*

> > (iv) is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455.

### 2) § 455(a) requires recusal where a reasonable observer would harbor doubts concerning Judge Crone's impartiality

In applying § 455(a), a Court considers "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860–61 (1988)).

"The goal of section 455(a) is to avoid even the appearance of partiality." *Liljeberg* 486 U.S. at 860. Under the section, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "Put simply, avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself." *Jordan*, 49 F.3d at 155–56 (5th Cir. 1995). As the Fifth Circuit has stated:

> According to the report of the House Judiciary Committee, the general standard of section 455(a) was designed to promote the public's confidence in the impartiality and integrity of the judicial process by saying, in effect, that **if any reasonable factual basis for doubting the judge's impartiality exists, the judge 'shall'**

> **disqualify himself and let another judge preside**. 1974 U.S. Code Cong. &
> Admin. News, pp. 6351, 6354–55.

*Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1110–11 (5th Cir. 1980) (emphasis added).

Because the appearance of partiality standard is objective and based on the doubts of a reasonable observer, it is irrelevant whether the judge actually has knowledge of the facts that would give rise to disqualification or has, for example, forgotten them. If a reasonable observer would expect that the judge would have the disqualifying knowledge then recusal is required. *Liljeberg*, 486 U.S. at 860–61.

The statutory recusal standard, unlike the recusal standard under the Due Process Clause, *see infra* Section III.B, does not require that the risk of personal bias rise to an unconstitutional level. *See United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990). And if "a reasonable person might harbor doubts about the trial judge's impartiality," the judge should err in favor of recusal. *Republic of Pan. v. Am. Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)).

Courts applying the recusal standard under § 455(a) must assume the perspective of a non-judicial observer, overcome the tendency of judges to give each other the benefit of the doubt, and be "mindful that an observer of our judicial system is less likely to credit judges' impartiality than the judiciary." *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995); *Liljeberg*, 486 U.S. at 864–65 ("People who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.")

**3) § 455(b)(1) requires recusal because Judge Crone holds a personal bias or has obtained personal knowledge through her supervision of, ex parte communications with, and long-term working relationship with the jury coordinator and other court staff implicated in the unlawful jury selection process in this case**

Section 455(b)(1) requires recusal when a judge holds "personal bias" or has obtained "personal knowledge" of the case. As a general matter, and as discussed *infra*, "personal knowledge" has been described as "extrajudicial knowledge." In many ways, § 455(b)(1) has been absorbed by the far broader § 455(a) but, notably, under this provision recusal is required where the presiding judge has the relevant knowledge even if a reasonable observer would not doubt the judge's ability to be impartial.

In the present case, the personal bias or personal knowledge of Judge Crone derives from: Judge Crone's role and responsibility as supervisor of the jury selection process; Judge Crone's off the record and *ex parte* communications with jury coordinator, Beth Harper, regarding the process of jury selection in this and other cases involving similar problems with the assembly of the venire; Judge Crone's off the record communications with trial counsel about the selection of the venire in this case; Judge Crone's long-time working relationship with relevant court staff[25]; and, Judge Crone's opinion, based on many years of working together, of the credibility of court staff.

**4) While a disposition or opinion requiring recusal will normally arise from an extra-judicial source, this is not a requirement and, in any event, Judge Crone's activities in administering and supervising the Jury Plan count as extra-judicial for these purposes**

Disqualifying information, dispositions, or opinions under either subsection (a) or (b) of § 455 will usually, but not necessarily, arise from an extra-judicial source.

---

[25] Including, but not limited to, Beth Harper, David Maland, and Terry Splawn.

17

Discussing the pre-§ 455 standard of bias or prejudice, the Supreme Court stated that, generally, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). However, the Court subsequently made clear that this language from *Grinnell* "clearly meant by 'extrajudicial source' a source outside the judicial proceeding at hand—which would include as extrajudicial sources earlier judicial proceedings conducted by the same judge (as are at issue here)." *Liteky v. United States*, 510 U.S. 540, 545 (1994).

The Court in *Liteky* refused to endorse an extra-judicial source "doctrine" as opposed to an extra-judicial source "factor," reasoning that the true focus is on whether any favorable or unfavorable disposition or opinion by a judge is "wrongful or inappropriate" and stating that that this may stem from the disposition or opinion:

- being undeserved;
- being excessive in degree; or,
- resting upon knowledge that the judge presiding in the cause ought not to possess.

*Id*. at 550. The Court held that normally, unless excessive in degree, a disposition or opinion resting upon knowledge that the judge "properly and necessarily acquired in the course of the proceedings" will not require recusal. *Id.* at 551. It is in this sense that the Court considered the extra-judicial source of information possessed by a judge to be relevant in the context of § 455.

A question then arises in the jurisprudence as to the circumstances in which knowledge of substantive facts can be said to have an extra-judicial source; or to put it another way, whether it is knowledge that the presiding judge, needing to appear impartial, ought not possess.

The Seventh Circuit has held that off the record briefings in chambers are considered extra-judicial, giving particular emphasis to the extent to which the information received enters the record of the proceedings and may be tested by the tools of the adversary process:

> The point of distinguishing between "personal knowledge" and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is "extrajudicial." Thus information a judge learns at a workshop devoted to a subject is extrajudicial, *In re School Asbestos Litigation*, 977 F.2d 764 (3d Cir. 1992); *Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36, 41 & n.4 (4th Cir. 1995), even though the workshop is open to other persons, and evidence could be taken about the proceedings. Off-the-record briefings in chambers, by contrast, leave no trace in the record—and in this case the judge has forbidden any attempt at reconstruction. What information passed to the judge, and how reliable it may have been, are now unknowable. This is "personal" knowledge no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated. Instead of going himself, this judge appointed agents, who made a private report of how they investigated and what they had learned. Mandatory disqualification under § 455(b)(1) follows.

*Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996). This rationale has been adopted by the First, Third and Ninth Circuits.[26] Counsel has not identified a case in which the Fifth Circuit has directly opined on this issue and so commends to the Court the above-cited persuasive authority.

Just as off-the-record briefings in chambers are considered extra-judicial for the purpose of assessing the need for recusal because they are not part of the record or subject to adversarial

---

[26] *United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001) (citation omitted) ("The Seventh Circuit's rationale applies here. When a judge receives information that does not enter the record, the reliability of that information may not be tested through the adversary process. Moreover, it is difficult, if not impossible, for a judge, no matter how sincere, to purge that information from her mind—and, equally, to maintain the perception of impartiality."); *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 308 n.18 (3d Cir. 2004) (citation omitted) ("We agree with the *Edgar* court that off-the-record discussions on substantive issues in chambers constitute 'personal' or 'extrajudicial' knowledge in the sense that the information conveyed to the judge leaves no trace in the record and cannot 'be controverted or tested by the tools of the adversary process.'"); *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 1000 (9th Cir. 2003) (distinguishing but agreeing with *Edgar*'s conclusion that *ex parte* information from court-appointed expert is received in a personal rather than judicial capacity).

testing, the reasonable observer standard in § 455(a) relies upon objectively ascertainable information and does not extend to what happens in judge's chambers or to the judge's actual virtue. Were the reasonable person's knowledge to extend this far it would collapse the appearance of partiality standard into a requirement of proof of actual prejudice. *Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983). Thus, the Court in *Hall* held that an appearance of partiality was created by the participation in a case of a law clerk who had accepted employment with a firm representing a party, whether the law clerk actually affected the magistrate's decision and despite the magistrate's statement that the law clerk did little more than take dictation.

**5) § 455(b)(5)(iv) requires recusal because Judge Crone is likely to be a material witness in the proceeding as a result of her supervision of, ex parte communications with, and long-term working relationship with the jury coordinator and other court staff implicated in the unlawful jury selection process in this case**

Section 455(b)(5)(iv) requires recusal where the judge is likely to be a material witness in the proceeding. In the present case, the likelihood of Judge Crone being a material witness derives from the same list of entanglements as described above in respect to § 455(b)(1) and is essentially a flipside to having personal knowledge of disputed evidentiary facts. Judge Crone was a witness on the record and off to the process that produced the tainted Special Wheel and the trial venire and was a witness to communications between herself and court staff responsible for the jury selection. If Judge Crone is to rely upon her own observations and communications then that knowledge must more properly be received as evidence from the witness stand. If Judge Crone is to make any disclosure on the record of information relevant to the Claims from her own knowledge then, once again, that disclosure needs to come from the witness stand.

20

**6)  As the judge presiding over the present cause will be called upon to pass on the actions and credibility of Eastern District court staff and the actions of Judge Crone, this is an appropriate case for a judge to be assigned from outside the district**

As recusal is required and the assignment of another judge necessary, it is appropriate that the newly assigned judge should come from outside the Eastern District of Texas. The Fifth Circuit Court of Appeals has embraced the solution of assigning causes to a judge from outside of the district in which it originated to ensure that the appearance of impartiality can be satisfied, particularly where the assigned judge may need to effectively pass on the original judge's actions. *Jordan*, 49 F.3d at 159 & n.18 (5th Cir. 1995) (embracing the solution of assigning a judge outside the district where the new judge may need to effectively pass on the rulings of the recused judge and noting the need to do this to maintain public confidence given how closely judges in a district work together and the reluctance to cast aspersions on judicial colleagues); *Couch*, 896 F.2d at 79–80 (5th Cir. 1990) (case assigned to judge outside district who handled resentencing to avoid appearance of partiality that might arise if a judge in the district were assigned the matter); *United States v. O'Keefe*, 128 F.3d 885, 900 (5th Cir. 1997) (assignment outside the district is a discretionary remedy appropriate to "avoid placing a district judge's colleagues in the uncomfortable position of passing on her previous rulings").

Assignment to a judge outside the district is appropriate in the circumstances of the present case where the judge hearing the claims will need to pass on the prior rulings and actions of Judge Crone as well as the actions of the core court staff of the Eastern District of Texas, who have acted under the supervision of the Court.

Such an assignment would not create any particular difficulties in the case. Indeed, it is only relatively recently that this Court has ended a practice of having a different judge hear § 2255 proceedings than the judge who presided at trial.

21

**B.    Recusal is required under the Due Process standard given the unacceptable risk of bias and the intractable appearance of bias in Judge Crone presiding over the present cause**

A fair trial before a fair tribunal is a "basic requirement of due process" and in order to avoid even the probability of unfairness, no person can be a judge in her own case or try cases in which she has an interest in the outcome. *In re Murchison*, 349 U.S. 133, 136 (1955).

The idea "that jurists should stand fair and impartial between the parties who appear before them" stretches back to ancient times. Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges*, at 3, 7 (3d ed. 2017). At common law, the presence of a party linked to the cause at hand would violate due process. In *R. v. Sussex Justices, Ex parte McCarthy*, [1924] 1 K.B. 256 (1923), one of the leading English cases on the subject, the King's Bench emphasized "a long line of cases show[ing] that it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done." *Id.* at 259 (emphasis added, internal quotations omitted). In *McCarthy*, a clerk to the trial justices in a criminal case was also a partner in a law firm that represented the defendant in a related civil matter. The justices convicted the defendant and reached their decision without consulting the clerk, who "scrupulously abstained from referring to the case." *Id.* at 257. On appeal, the King's Bench concluded that, under the weight of commanding authority, it mattered not "what actually was done;" instead, its analysis depended on "what might appear to be done." *Id.* at 259. The court overturned the conviction, holding that "[n]othing is to be done which creates even a suspicion that there has been an improper interference with the course of justice." *Id.*

Consistent with this historical rule, the Supreme Court has said, "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio*, 273

22

U.S. 510, 532 (1927). This is a "stringent rule," which "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) (quoting *Murchison*, 349 U.S. at 136); *see also In re Al-Nashiri*, 921 F.3d 224, 237 (D.C. Cir. 2019) ("[A]ppearance may be all there is, but that is enough." (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001))). The rule has been "jealously guarded." *Jerrico*, 446 U.S. at 242; *see also Murchison*, 349 U.S. at 136; *Ward v. Monroeville*, 409 U.S. 57 (1972); *Tumey*, 273 U.S. at 532. Thus, the Supreme Court has held that due process mandates recusal when, considering all the circumstances alleged, the risk of bias is too high to be constitutionally tolerable. *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (*per curiam*). The constitutional standard does not require an allegation or proof of actual or subjective bias. *Id.* Instead, the question is "whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). Of course, the "Due Process Clause demarks only the outer boundaries of judicial disqualifications," and statutes may impose "more rigorous standards." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986).

### C.    The heightened standard in capital cases

The Eighth Amendment requires a heightened need for reliability in the determination that a death sentence is the appropriate punishment in a specific case. *Caldwell v. Mississippi*, 472 U.S. 320, 323, 340–41 (1985); *Monge v. California*, 524 U.S. 721, 732 (1998) ("recogniz[ing] an acute need for reliability in capital sentencing proceedings" (citations omitted)).

Capital proceedings must be policed at all stages by an "especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge*, 524 U.S. at 732 (citations omitted). This is a function of the qualitative difference between a death sentence and even the longest term of imprisonment, which requires a corresponding difference in the need for reliability

23

in capital cases. *Lockett v. Ohio*, 438 U.S. 586, 603 (1978). "In no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d 224, 239 (D.C. Cir. 2019).

An especially vigilant concern for procedural fairness, and a similarly increased demand for ensuring public confidence in death cases, militates strongly in favor of recusal. If Mr. Snarr is to be led to the death chamber and killed, it should only be after a proceeding in which he and the community can have the highest confidence, and a proceeding in which Judge Crone presides over the determinations regarding the propriety of the jury selection in which she herself was involved is not such a proceeding.

**IV.    Ultimately, a reasonable observer, knowing all the facts in the present matter, would harbor doubts concerning Judge Crone's impartiality even if, in fact, Judge Crone would be able to hold the balance true**

In the present circumstances, a reasonable and objective person, knowing all of the facts, would certainly harbor doubts concerning Judge Crone's impartiality.

The presiding judge addressing Claim I of Mr. Snarr's Amended § 2255 motion will have to determine whether to allow discovery, whether to allow an evidentiary hearing, whether cause is shown due to the Court or its officials misleading the defense, and whether the Court and its staff violated the Constitution, the Jury Plan, and the Jury Selection and Service Act by selecting a non-random, unrepresentative jury venire.

The idea that these judicial tasks should be performed by the judge who presided over the unlawfully constructed venire and presented the court official who made misleading statements as to how the wheel and venire were being constructed is inconsistent with our constitutional and statutory scheme. It is also inconsistent with our common understanding of fairness.

The question of whether a reasonable observer would harbor a doubt as to Judge Crone's partiality is to be determined without regard to whether Judge Crone is, in fact, impartial. This

assessment is to be based not upon what Judge Crone knows or remembers from her involvement in the jury selection—both on and off the bench—but rather what a reasonable observer would expect Judge Crone to know given her position and duty to supervise the process.

Further, as reference above, the Supreme Court and the Fifth Circuit have warned that the appearance of partiality standard, while not needing to pander to extreme conspiracy theorists, must be aimed at members of the public who are "often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg*, 486 U.S. at 864–65; *see also Jordan*, 49 F.3d at 157 ("We are mindful that an observer of our judicial system is less likely to credit judges' impartiality than the judiciary.")

With this in mind, federal courts have granted self-recusal where witnesses will be court employees with whom the judge has had frequent, friendly encounters and, particularly, where the court holds a former clerk in high regard and credibility is an issue. *United States v. Twitty*, 2013 U.S. Dist. LEXIS 134866, at *7 (D. Colo. Sep. 20, 2013); *United States v. Ferguson*, 550 F. Supp. 1256, 1260 (S.D.N.Y. 1982). In doing so, the courts have been careful to recognize the appearance of bias that arises, even where the judge feels confident in his or her ability to remain impartial. *Id.* Recusal will also be required where a judge will be called upon to consider the credibility of another judge of the same court. *Sandford v. United States*, 2017 U.S. Dist. LEXIS 97097, at *7–8 (N.D. Miss. June 23, 2017) *See also State v. Elie*, 232 So.2d 507, 511 (1970) (recognizing appearance of partiality in judge who devised jury selection scheme hearing a motion to quash the indictment).

Here, Judge Crone would be asked to pass on the actions and credibility of staff of the Court with whom she has worked hand-in-glove over a course of years, including in the assembling of jury venires, and importantly, the venire in this case. Furthermore, Judge Crone would be asked

25

to pass judgment on her own actions as well as those of her judicial colleagues in supervising the implementation of the Jury Plan. To borrow from the language of *Liljeberg*, if Judge Crone did not know that a Special Selection was being made in violation of the Jury Plan, she "certainly should have known." *Liljeberg*, 486 U.S. at 868. Similarly, if Judge Crone did not know that the method of jury selection was non-random and that the certificate required to be produced by law and provided to the Chief Judge was nowhere to be found, she should have known. The Jury Plan places responsibility for jury selection on the Clerk of Court under the supervision of the judges. This supervision involves an active, administrative role, not simply the resolution of justiciable claims as they may arise.

Presiding over the initial questions of discovery and whether a hearing will be afforded on the claim presents no lesser appearance of partiality. In the circumstances, a reasonable observer would question Judge Crone's impartiality in determining whether to refuse discovery designed to develop evidence about the improper jury selection which she supervised, or might reasonably question, if discovery were granted where it should not have been, whether this was done to avoid an appearance of a cover up. *United States v. Martorano*, 1987 U.S. Dist. LEXIS 6225, at *14–15 (E.D. Pa. July 10, 1987) (disqualifying self from motion for discovery in support of recusal motion where either granting or refusing discovery might appear partial).

It is simply too much to expect that a reasonable observer would not harbor doubts about Judge Crone's ability to preside over this cause impartially in the circumstances.

Further, given Judge Crone's personal knowledge, her position as a material witness and the unconstitutional risk of bias, recusal is mandated under § 455 (b)(1), (b)(5)(iv) and the Due Process Clause.

26

Because the claim and the procedural steps that must be adjudicated under Claim I involve passing on the actions of the core court staff of the United States District Court for the Eastern District of Texas who have acted under the supervision of the judges of the Eastern District, this is precisely the type of unusual case where assignment of a judge from outside the district is appropriate. *Jordan*, 49 F.3d at159 & n.18, *Couch*, 896 F.2d at 79–80; *O'Keefe*, 128 F.3d at 900. Such a reassignment also forestalls a judge-by-judge analysis of whether each Eastern District of Texas judge's relationship to court officers like Ms. Harper, Mr. Maland, and to Judge Crone require their own independent recusal.

Particularly as this is a capital case in which Mr. Snarr's life is on the line and a well-supported showing of serious error in the assembly of the jury venire has been made, recusal is essential to preserve the appearance of impartiality.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Mr. Snarr request that this Court grant his motion for recusal and that the case be reassigned to a district court judge from outside the Eastern District of Texas.

Respectfully submitted,

*/s/ Lindsey Layer*

Jon M. Sands
Federal Public Defender
Lindsey Layer (VA No. 79151)
Megan Barnes (SC No. 104368)
Assistant Federal Public Defenders
850 W. Adams St., Suite 201
Phoenix, AZ 85007
lindsey_layer@fd.org
megan_barnes@fd.org
(602) 382-2816 Telephone
(602) 889-3960 Facsimile

Kathryn Nester
Nester Lewis PLLC
50 W. Broadway, Suite 300
Salt Lake City, UT 84101
kathy@nesterlewis.com
(801) 535-5375 Telephone

## CERTIFICATE OF SERVICE

I hereby certify that on January 25th, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties.

/s/ Daniel Juarez
Assistant Paralegal

## CERTIFICATE OF CONFERENCE

This is to certify that undersigned counsel conferred with AUSA Traci Kenner, Counsel for the Government, and she advised that the government opposes this motion.

/s/ Lindsey Layer

28