# Attachment 1

**Appendix E**

## PLAN FOR THE RANDOM SELECTION OF JURORS

## U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

### as amended March 26, 2009

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. § 1861 et seq.("the Act"), the following Plan for the Random Selection of Jurors is adopted by this Court superseding the plan now in effect, subject to approval of this Plan by a reviewing panel of members of the Fifth Judicial Circuit Council and to such rules and regulations as may be adopted from time to time by the Judicial Conference of the United States.

1

Section 1.    Declaration of Policy
Section 2.    Application of Plan
Section 3.    Management and Supervision of Jury Selection Process
Section 4.    Source of Names of Prospective Jurors
Section 5.    Selecting of Names of Prospective Jurors from Source Lists
Section 6.    Master Jury Wheels
Section 7.    Qualification for Service
      a.    Disqualified for Jury Service
      b.    Exemptions from Jury Service (Barred from Service)
      c.    Excuses from Jury Service
      d.    Individual Excuses from Jury Service
      e.    Jurors Excluded by the Court
Section 8.    Qualified Jury Wheel
Section 9.    Drawing of Names from Qualified Wheels; The Issuance of Summonses; and Disclosure of Names
      a.    Drawing of Names
      b.    Issuance of Summonses
      c.    Petit Jury Panels
      d.    Grand Jury Panels
      e.    Disclosure of Names
Section 10.    Definitions and General Provisions

\* \* \* \* \*

## Section 1.  Declaration of Policy

It is the policy of this Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of this Court that all citizens shall have the opportunity to be considered for service on grand and petit juries and shall have an obligation to serve as jurors when summoned for that purpose.

No citizen shall be excluded from service as a grand or petit juror in this Court on account of race, color, religion, sex, national origin, or economic status.

## Section 2.  Application of Plan

The Eastern District of Texas is hereby divided for jury selection purposes into six jury divisions. Each county within the District is included in one of the following jury divisions:

Beaumont Division:    Hardin, Jasper, Jefferson, Liberty, Newton and Orange Counties.

Marshall Division:    Camp, Cass, Harrison, Marion, Morris and Upshur Counties.

Sherman Division:    Delta, Fannin, Hopkins, Lamar, Collin, Cooke, Denton and Grayson Counties.

2

028652

Texarkana Division:   Red River, Bowie, Franklin and Titus Counties.

Tyler Division:       Anderson, Cherokee, Gregg, Henderson, Panola, Rains, Rusk, Smith, Van Zandt and Wood Counties.

Lufkin Division:      Angelina, Houston, Nacogdoches, Polk, Sabine, San Augustine, Shelby, Trinity and Tyler Counties.

Section 3.  Management and Supervision of Jury Selection Process

The clerk of the court shall manage the jury selection process.  The clerk shall act under the supervision and control of the judges of this district.

This district, by adoption of this plan, has elected to operate the jury selection process under a fully automated, electronic data processing system.

Section 4.  Source of Names of Prospective Jurors

Texas law provides for a statutory registration of voters of the age of 18 years and upwards, which is uniform in all of the counties. Voter registration lists represent a fair cross section of the community in the Eastern District of Texas.  Accordingly, the names of all grand and petit jurors serving on or after the time provided in this plan shall be selected at random from the Master Registration Lists maintained by the Secretary of the State of Texas of all persons registered to vote in the most recent federal general election held every two years.

The court finds that it is not necessary in this district to prescribe some other source or sources of names in addition to the official lists of registered voters in order to foster the policy and protect the rights secured by the provisions of the Act.

Section 5.      Selecting of Names of Prospective Jurors from Source Lists

For each jury division, names of prospective jurors shall be determined by the following procedure.  The voter registration lists shall be arranged numerically by voter certificate number within the county and the counties shall be arranged alphabetically to form one continuous list of names for each division.  Each name shall then be numbered consecutively to form a Master Source List.

Random selections from the Master Source Lists may be made using a computer-generated random selection process to select the required number of names from the Master Source List in order to insure that (a), any group of names chosen will represent, in substantially correct proportions, the names on all voter registration lists of all counties comprising the master jury wheel; (b), that the mathematical odds of any single name being picked are substantially equal, and (c), that the possibility of human discretion or choice affecting the selection of any individual's name is eliminated.

Section 6.      Master Jury Wheels

The clerk or any other person authorized by the court shall establish and maintain one

3

Master Jury Wheel for each jury division. The physical form of records on which names for the Master Jury Wheel are kept may include such electronic data storage devices as magnetic tapes or magnetic disk files. The Master Jury Wheel shall contain the names, or numbers corresponding to names on file, of those persons selected at random for prospective jury duty.

The minimum number of names, or numbers corresponding to names, to be placed in each Master Jury Wheel shall be at least one thousand. The clerk shall insure that at all times a sufficient number of names are contained in each of the wheels so that grand and petit jury panels may be drawn at any time required by the court. Such additional names shall be selected at random from voter registration lists in compliance with the Act and this Plan.

Each master jury wheel shall be emptied and refilled every two years, immediately following federal general elections and as soon as complete and current voter registration lists are available from the Secretary of the State of Texas following such federal general elections. The emptying (removal) of unused names in the wheels shall be accomplished by July 1 unless the court should find it necessary to authorize the clerk to extend that time.

As required by the Judicial Conference of the United States, a report shall be prepared after each periodic refilling of each master jury wheel giving general data relating to the master jury wheel with an analysis of race and sex of prospective jurors based on juror qualification forms returned during the qualifying process. Such report shall not be made until six months after summoning the first panels from the jury wheels in order to provide sufficient data to complete the analysis. For the purposes of determining proportional representation in the master jury wheels, data from the most recent Bureau of Census information shall be used for comparisons. The clerk shall have the capacity to prepare an alphabetical list of the names drawn, which list shall not be disclosed to any person except pursuant to this Plan and the Act.

Upon completion of the random selection of names for the divisions' master jury wheels, the individual(s) who performed the task of randomly selecting the names pursuant to this Plan shall prepare and execute a certificate detailing their procedures and reporting on the performance and completion of the assignment and transmit the same promptly to the chief judge of the district.

A general notice shall be posted in the clerk's office and on the court's website that explains the process by which names for jury wheels are randomly and periodically drawn.

Section 7.     Qualification for Service

Any judge of this district shall determine whether a person is disqualified, exempt, excused, or excluded from inclusion on a jury panel or from service as a juror while presiding over his or her docket. The clerk and other authorized deputy clerks of this court in the management of the jury selection process and by compliance with the criteria set out below in this Plan shall determine at the time the qualified wheels are being established whether a person is disqualified, exempt, or excused from inclusion on the qualified wheels. Such determinations shall be made on the basis of information provided on the juror qualification form and other competent information.

Whenever a person is disqualified, excused, exempt, or excluded from jury service, the

4

clerk shall note in the space provided on the juror qualification form the specific reason therefor. If a person did not appear in response to a summons, such fact shall be noted on the juror list.

a.    Disqualified for Service

Any person shall be deemed qualified to serve on grand and petit juries in this district court unless he or she--

(1)    is not a citizen of the United States;

(2)    is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3)    is unable to speak the English language;

(4)    is incapable, by reason of mental or physical infirmity, to render satisfactory jury service;

(5)    has a charge pending against him or her, or has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored;

(6)    is under eighteen years of age; or

(7)    has not been a resident of the judicial district for at least a year.

b.    Exemptions from Jury Service (Barred from Service)

Under the provisions of 28 U.S.C. § 1863 (b)(6), the court hereby finds that exemption of the following groups of persons is in the public interest and would not be inconsistent with 28 U.S.C. §§ 1861 and 1862. Accordingly, members of the following groups are barred from jury service:

(1)    members in active service in the Armed Forces of the United States;

(2)    members of the fire or police departments of any State, district, territory, possession, or subdivision thereof;

(3)    public officers in the executive, legislative, or judicial branches of the Government of the United States, or any State, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties. "Public officer" shall mean a person who is either elected to a public office or who is directly appointed by a person elected to public office.

c.    Excuses from Jury Service

This district court, pursuant to 28 U.S.C. § 1863 and by adoption of this Plan, finds that

5

028655

the following persons must be excused from jury service upon individual request:

(1)    A person who is over 70 years of age;

(2)    A person who has served in federal court as a grand or petit juror within the last two years (see 28 U.S.C. § 1866(e));

(3)    A person who serves as a volunteer (without compensation) in an official capacity as a firefighter or a member of a rescue squad or ambulance crew for a public agency. A "public agency" for this purpose means the United States, any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, or other territory of the United States, or any unit of local government, department, or instrumentality of any of the foregoing; and

(4)    A full-time student in a secondary school, college, university or technical school.

d.    Individual Excuse from Jury Service

In addition to the members of classes or groups subject to excuse from jury service, any person summoned for jury service may be excused from service during the session for which the juror was summoned by the judge presiding over his or her respective docket or by the clerk based upon a showing of undue hardship or extreme inconvenience.

The names of those jurors who have been excused from a panel for hardship or extreme inconvenience reasons will be put back in the qualified jury wheel where they will be subject to subsequent random selection, unless the court should rule otherwise at the time of granting the excuse.

e.    Jurors Excluded by the Court

Pursuant to the provisions of 28 U.S.C. § 1866 , any juror who has been summoned for jury service may be excluded by the judge in open court upon the following grounds:

(1)    that such person may be unable to render impartial jury service or that his or her service as a juror would be likely to disrupt the proceedings; or

(2)    excluded upon peremptory challenge as provided by law; or

(3)    excluded pursuant to the procedure specified by law upon a challenge-by any party for good cause shown; or

(4)    excluded upon determination by the court that his or her service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

Any person excluded from a particular jury under clause (1), (2), or (3) of this section

6

028656

shall be eligible to sit on another jury if the basis for the person's initial exclusion would not be relevant to the person's ability to serve on such other jury.

Section 8.  Qualified Jury Wheel

The clerk shall maintain or cause to be maintained a separate qualified jury wheel for each jury division in the district, and shall place in such wheels the names of all persons drawn from the Master Jury Wheel of the relevant jury division who are found not disqualified, exempt, or excused pursuant to this Plan.  The clerk shall insure that at all times a sufficient number of names are contained in each of such wheels so that grand and petit jury panels may be drawn at any time required by the court.

Each time a jury division's master wheel is refilled, the qualified wheel then in use shall be emptied as soon as the process of qualifying jurors from the new Master Wheel has produced a sufficient number of qualified jurors to begin supplying the court's needs.  The emptying (removal) of unused names in the qualified wheels shall be accomplished by July 1 unless the court should find it necessary to authorize the clerk to extend that time.

Section 9.    Drawing of Names from Qualified Jury Wheels; The Issuance of Summonses; and Disclosure of Names

a.    Drawing of Names

As and when jurors are required by the court the clerk shall draw at random from the qualified jury wheel of the relevant jury division(s), the required number of names to serve on a petit or grand jury panel.  Each name as it is drawn shall be counted in sequence, starting with number one, until the number of names required to fill the panel are drawn.  These names shall then be arranged alphabetically on a list.  The list may be printed or retained on a computer for future use.  Each list shall also include the person's number, mailing address, and county.  Such a list shall be prepared for each jury panel.

b.    Issuance of Summonses

The clerk shall cause to be mailed to every person whose name is drawn from the master jury wheel a juror qualification form accompanied by instructions to fill out and return the form duly signed and sworn, to the clerk by mail        within ten days.  Procedures as set forth in the  section 1864, shall be followed in securing returns of the completed questionnai

Each person drawn for jury service will be served a summons by first-class mail addressed to such person at his or her usual residence or business address.

c.    Petit Jury Panels

Names of all petit jurors drawn to fill a panel as provided in this Plan who are not disqualified, excluded, exempt or excused and who report for jury duty at a session of court, shall be randomly selected by the clerk for each jury case tried during the session as directed by the court.

7

028657

When there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists in a manner ordered by the court consistent with sections 1861 and 1862 of the Act.

d.    Grand Jury Panels

There will ordinarily be three grand juries sitting in the Eastern District of Texas; the Beaumont grand jury ordinarily hears cases arising from the counties of Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, Sabine, San Augustine, Trinity, and Tyler counties; the Sherman grand jury ordinarily hears cases arising from the counties of Collin, Cook, Delta, Denton, Fannin, Grayson, Hopkins, Lamar and Red River counties; and the Tyler grand jury ordinarily hears cases arising from the remaining counties of the district. When a particular grand jury is not in session but one of the other grand juries is, the court may direct that business which would normally come before the grand jury not in session will be handled by a grand jury currently in session. In the interest of achieving administrative economies, the court may at any time direct that one grand jury panel comprised of jurors drawn from the qualified jury wheel of only one jury division shall serve the entire judicial district.

The clerk, upon court order, will assemble a grand jury panel by randomly drawing or causing to be drawn, names from the appropriate qualified wheel(s) for a grand jury. The same selection process as outlined above for petit jury panels shall be used for grand jury panels. When a grand jury panel is drawn from the qualified wheels of more than one jury division, names shall be drawn in a proportionately appropriate number depending on the number of names of registered voters on the source list when the wheels were first filled. No list shall contain less than three names from each appropriate division.

When there is an unanticipated shortage of available grand jurors drawn from the qualified jury wheel(s), the court may require the marshal to summon a sufficient number of grand jurors selected at random from the voter registration lists in a manner ordered by the court consistent with sections 1861 and 1862 of the Act.

e.    Disclosure of Names

The lists of all names drawn from any qualified wheel to fill a petit or grand jury panel shall not be disclosed and made available to parties and the public until jurors have been summoned, have responded, and have been found to be qualified and available to serve based on information secured from the qualification form sent with the summonses.

(1)    Disclosure of Petit Jury Lists. The lists of names of prospective petit jurors shall be disclosed only by the Courtroom Deputy at the time of voir dire proceedings, and not prior to that time. All such lists shall be returned to the Courtroom Deputy at the conclusion of such voir dire proceedings. These restrictions shall not limit the authority of the Chief Judge of this District, or any judicial officer of this District while presiding over his or her respective docket, to release any such list of names at an earlier time where such earlier release is consistent with this Plan or other pertinent statute.

(2)    Grand Jury Panels. The list of names of persons summoned to any court in this

8

District for prospective grand juror service shall remain confidential. The names of persons chosen to serve as grand jurors in this District shall remain confidential in the interest of justice until otherwise ordered by the Court 28 U.S.C. § 1863(b)(7).

(3)    Disclosure of Juror Information to the Media and the Public. A request for disclosure of juror names to the media or public may be made of the judge to whom the case is assigned in accordance with the above provisions relating to the timing of the release of juror information. The clerk shall not release juror names to the media or public unless specifically authorized by the assigned judge.

Section 10.    Definitions and General Provisions

There is incorporated herein by reference as an integral portion of this Plan, the provisions of Sections 1861 to 1871, both inclusive, and Section 1878 of Title 28, United States Code, together with all amendments of said sections which may hereafter be made, and all laws hereafter enacted related to grand petit juries, and trial by jury in the United States.

9

# Attachment 3

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 12 of 81 PageID #: 1168

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION


UNITED STATES OF AMERICA  |  DOCKET NO. 1:09CR15
                          |
                          |  OCTOBER 30, 2009
VS.                       |
                          |  10:12 A.M.
                          |
MARK ISAAC SNARR AND      |
EDGAR BALTAZAR GARCIA      |  BEAUMONT, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 35

REPORTER'S TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------


APPEARANCES:

FOR THE GOVERNMENT:     JOSEPH ROBERT BATTE
                        KERRY KLINTWORTH
                        ANTONETTA STANCU
                        U.S. ATTORNEY'S OFFICE
                        350 MAGNOLIA
                        SUITE 150
                        BEAUMONT, TEXAS 77701


FOR DEFENDANT GARCIA:   ROBERT A. MORROW, II
                        ATTORNEY AT LAW
                        24 WATERWAY AVENUE
                        SUITE 660
                        THE WOODLANDS, TEXAS 77380

                        GERALD E. BOURQUE
                        ATTORNEY AT LAW
                        24 WATERWAY AVENUE
                        SUITE 660
                        THE WOODLANDS, TEXAS 77380


Tonya B. Jackson, RPR-CRR
051959 409.654.2833

Case 1:13-cv-00724-MAC-CLS   Document 146-3   Filed 01/25/23   Page 13 of 81 PageID #: 10648

Status Conference

2

FOR DEFENDANT SNARR:     GEORGE PATRICK BLACK
                         FEDERAL PUBLIC DEFENDER
                         110 NORTH COLLEGE
                         SUITE 1122
                         TYLER, TEXAS 75702

                         DOUGLAS MILTON BARLOW
                         ATTORNEY AT LAW
                         485 MILAM
                         BEAUMONT, TEXAS 77701


COURT REPORTER:          TONYA B. JACKSON, RPR-CRR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 239
                         BEAUMONT, TEXAS  77701


   PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
  TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

Case 1:13-cv-00724-MAC-CLS   Document 146-2   Filed 01/25/23   Page 14 of 81 PageID #: 11170

Status Conference

3

(Open court, defendants present)

THE COURT:  This is Case No. 1:09CR15, *United States of America versus Mark Isaac Snarr and Edgar Baltazar Garcia.*

Are you ready to proceed?

MR. BATTE:  Ready, your Honor.  The government is ready.  Joe Batte, Kerry Klintworth, and Antonetta Stancu for the government.

MR. MORROW:  Robert Morrow and Gerald Bourque for Mr. Garcia, your Honor.

MR. BARLOW:  Doug Barlow and Mr. Pat Black for Mr. Mark Snarr, your Honor.

THE COURT:  All right.  This is a status conference today.  So, we need to talk about the status, I think.  We also -- we're having the jury coordinator discuss the progress being made on getting the jury.

Before we do that, is there anything you want to bring up?

MR. BATTE:  Not from the government, your Honor.

MR. MORROW:  Judge, would this be a good time to talk about the motion deadline on November the 9th?  Would that be appropriate at this point?

THE COURT:  We can talk about that.

MR. MORROW:  Judge, we have a deadline to file

Case 1:13-cv-00724-MAC-CLS   Document 146-2   Filed 01/25/23   Page 15 of 81 PageID #: 1171

our guilt motions by November the 9th.  We spoke with Mr. Batte yesterday about requesting an extension on that.  Discovery is coming in to us.  I think he told me yesterday that the guilt discovery has been concluded, but we're still getting punishment discovery.  But there's also a matter of BOP records of the discipline of the guards that were involved in this incident, and we have to bring a motion to the court to ask that those reports be provided to us because they will not be disclosed without an order from the court.  Bottom line, your Honor, is we still have more information coming in. We would ask for a 30-day extension on the deadline for filing our guilt motions which are currently now due November the 9th.

THE COURT:  What's the government's position on that?

MR. BATTE:  I think I agree with everything that Mr. Morrow said, first of all.  We don't really object to them moving the deadline.  If --

THE COURT:  Well, I just wonder how that's going to fit into everything else.  I mean, is it going to affect other deadlines?

MR. MORROW:  His response deadline, obviously. You gave us until February to file the punishment motions, and we hope we will be -- we are going to work

5

to meet that deadline; so, it wouldn't affect that.

THE COURT: Okay. Well, whatever orders you need, get that to me. I will sign them, to get the information that you need.

MR. MORROW: Yes, judge. Thank you. We will.

THE COURT: I don't have a particular problem with moving that if no one has a problem with it.

MR. MORROW: Thank you.

MR. BATTE: Okay.

THE COURT: All right. So, we'll move that guilt/innocence pretrial motions -- is December 9th a business day?

COURTROOM DEPUTY: It's a Wednesday.

THE COURT: Okay. So, that will be fine.

MR. MORROW: Thank you, judge.

THE COURT: But just get me that -- whatever it is -- it has to do with the guard's disciplinary records, people who were involved in the incident?

MR. MORROW: Yes, your Honor.

THE COURT: Okay. Does the government take a position on that or --

MR. BATTE: Well, your Honor, I've done a summary that I've given to the defense about what I think is admissible in terms of what the prison found the guards to have done wrong in their own internal

Tonya B. Jackson, RPR-CRR
051963 409.654.2833

6

investigation.  There's a full report that the office of internal affairs did prior to sanctioning the guards and some of them are going to be witnesses and the ones that are going to be witnesses, I've identified what the findings were.

In other words, for example -- by way of for example, they didn't have -- the internal investigation found that they didn't have enough staff escorting Mr. Snarr and Mr. Garcia back to their cell on that day and it was a violation of policy.  The internal investigation made that finding, and the guards that will testify were sanctioned as a result of that.  I did a summary as to what the investigation found and what the sanction was and I wrote it up and presented it to defense counsel, but there's a -- an entire report that contains other information not specific to these witnesses that I didn't feel comes under *Giglio*.  But defense counsel wants to see that, and I understand why they would want to.  The Bureau of Prisons doesn't want to disclose that for privacy reasons.

So, what I said was, when Mr. Morrow asked me for a copy -- and I presume Mr. Black and Mr. Barlow want one as well -- I said I'm not going to give that to you because I don't think it's relevant as *Giglio*, unless the court orders me to and then that way I'm covered and

Case 1:13-cv-00724-MAC-CLS Document 146-3 Filed 01/25/23 Page 18 of 81 PageID #: 1174
Status Conference

7

there's a protective order in place where, you know, if you decide that's something to let them have, they know that that can't be disclosed beyond themselves.  In other words, I don't want copies of this report made and being distributed and somehow getting out.  Not that I think that they would, but that's what the Bureau of Prisons is concerned about.  And, so, my position is I'm not going to give that report out unless Judge Crone orders me to give it, and then I'm going to ask that you do a protective provision in there.

THE COURT:  Okay.  What I think you need to do is file a motion, because I don't have a motion.  Then I probably need to look at this report in camera.  Maybe there's things that should be redacted.  I don't know what's in the report.  So, it's hard to say.

MR. BATTE:  That's fine.

THE COURT:  And that might solve some of the problems.  And certainly we would want it -- a protective order, I would think.

MR. BATTE:  That's fine.

MR. MORROW:  We'll have that to you in advance of the deadline, judge.  We already have a draft that we've been circulating; and we'll have it to you the first of next week, if that's okay.

THE COURT:  Okay.  All right.  That will be

Case 1:09-cr-00015-MAC-KFG   Document 375   Filed 10/06/10   Page 8 of 35   PageID #: 1175
Status Conference

8

good.  So, if you have the thing available so I can look at it -- how long is this report?

MR. BATTE:  Judge, I want to say it's 15 pages.  It's somewhere around there.  It's not, you know, terribly lengthy.

THE COURT:  But I guess I need to know which people might be witnesses or not.

MR. BATTE:  Well, I think there's a couple of issues.  One is the impeachment issue; and then the other is, you know, it may contain, in the defense's eyes, mitigating evidence of some sort.  So, that's something I guess that they're going to want you to consider, you know, in terms of giving it over.

I don't really have a problem giving the report over.  It's the protective part of it that I'm concerned with.

MR. BLACK:  Your Honor, if I can just add. We've had this issue come up before.  In fact, Mr. Batte and I -- I think we had this similar issue come up in the *Agofsky* capital murder case and in that case the entire report was given to the defense counsel to read and review and to use as necessary, but a protective provision was -- there was actually an order entered by the court saying that the defense could use it for trial preparation as necessary to effectively represent the

people that were named in the indictment but obviously we could not, you know, disseminate it, you know, freely to the public. It was to be used for trial preparation and for actual cross-examination at trial only.

So, I think I can speak for the co-defendant in this case as well and for their legal counsel that we're not opposed to some type of order being entered that would protect Mr. Batte's concerns and, also, it's BOP, I think, that has the main problem with this.

THE COURT: All right. Well, give me a draft of whatever order you might propose to protect it.

MR. MORROW: Judge, if I could just follow up on that. Mr. Black's point is well taken. And we wouldn't want to put the court in a position of determining what's mitigating and what's not when you don't know our punishment case. So, we would ask that the whole report be given to us with a protective order as opposed to anything being redacted at this point and that way you wouldn't be put in that position of trying to decide, you know, what we should or shouldn't get.

MR. BLACK: And that's what was done previously, your Honor, with the BOP records that were given to us.

THE COURT: Okay.

MR. BLACK: As long as we had, you know,

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 10 of 35   PageID #: 9177

Status Conference

10

restrictions which protected everyone and, yet, they were reasonable as well.

THE COURT:  I just think there might be something that's kind of irrelevant that might be -- I don't know what's in the report.  So -- okay.

MR. BLACK:  Well, I guess if Mr. Batte can look at it, if he feels like that there is something that may need to be redacted or have some concerns about, we can certainly visit with him about that.

THE COURT:  Okay.

MR. BATTE:  Okay.

THE COURT:  All right.  Anything else?

MR. MORROW:  That's all I have, judge.  Thank you.

THE COURT:  All right.  Ms. Harper, do you want to come talk about the jury?

MS. HARPER:  We are just now starting the process of building our new jury wheel for this case.  We will be sending out approximately 1500 to 1700 juror qualification questionnaires.  That is our first step in our procedure, which is outlined by our jury plan.

(Reading) Prospective jurors will be mailed a qualification questionnaire form to complete and return to the court.  After the court determines that they are qualified to serve, the names are entered into a pool and

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 22 of 81 PageID #: 10657

then they will be randomly summoned for the jury selection date. The counties that are included for the Beaumont division are Hardin, Jasper, Jefferson, Liberty, Newton, and Orange. The juror names are chosen at random from a master registration list that is maintained by the Secretary of State of all persons registered to vote.

And I do have a copy of the jury plan and the juror questionnaire that we'll be sending out, if each side would like a copy of that.

THE COURT: Would you like a copy of that?

MS. HARPER: It's on our Web site, the plan is.

THE COURT: Okay. Am I hearing "no" from counsel?

MR. MORROW: We'll have access to it through the Web site, your Honor. Thank you.

MR. BLACK: That's correct. We do not need a copy provided. We can obtain one, your Honor.

THE COURT: All right.

MS. HARPER: That's all I have at this point.

THE COURT: Well, one thing that came to mind on this, because we're doing this together, is there may be need for more peremptory challenges.

Have you thought about that?

MR. MORROW: Judge, I don't mean to give away

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 23 of 81 PageID #: 10658

any defense secrets; but certainly one of our motions will be a motion for severance. So, we hoped that you would let us file that and get a ruling on that before you go too far down that road of dividing up the peremptories.

THE COURT: Well, I think I've already thought about this; and I'm not inclined to grant a severance. So, if you want to get some more peremptories, maybe you need to talk to me about it.

MR. MORROW: Yes, your Honor. We'd like some extra ones.

THE COURT: But, then, you have to understand the problems that are involved in doing that because only 200 people can be in Judge Heartfield's courtroom. That's who comes the first day, and they fill out the questionnaires. So, you may get 200. The last trial with only one defendant, we got up to 180. We were at that point. So, we were -- there weren't many left over, and that was with 20 peremptories per side.

So, with that number showing up, I mean, I don't see more than a couple more peremptories per side feasible out of that group. If you want more than that, then we have to do something in another courtroom, I guess, the same day because I -- the people can't physically be in there. We'd have to do another

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 13 of 35 PageID #: 2180

Status Conference

13

proceeding in another courtroom and do sort of the same thing, less people, because none of the other courtrooms will hold that many people, and do the same thing.

MR. BARLOW: Did I understand the court correctly? 200 people? I thought it with a 250 that were --

THE COURT: 250 came, but I think only 200 actually --

MS. HARPER: 200 are actually pulled for the strike list and are seated.

THE COURT: In that room. We have some spares on reserve because people that day don't show up.

MR. BARLOW: Was it also because we entertained some of those on-the-spot challenges or excuses?

THE COURT: I think maybe the administrators got some people excused earlier.

MS. HARPER: Well, like we had somebody that was sick that morning. The extras are just in case we do have to pull somebody from the courtroom and bring them back up, in case they get sick; but they are actually in the jury room on that day.

MR. BARLOW: And I do recall in the past when the jurors are actually -- the particular jurors are actually summoned, the lawyers from each side have met up

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 14 of 35   PageID #: 9131
Caucus Conference

14

here at the clerk's office to examine the ones who want to claim an excuse so we could agree on some of those who --

THE COURT:  Right, ahead of time, as I recall.

MS. HARPER:  That's correct.

MR. BARLOW:  And if there was a question on either side, they were kept in the pool.

THE COURT:  That's right.

MR. BARLOW:  But if we both agreed, you know, that they were 80 years old and did not want to serve, then they were excused or something like that.  So, we culled through a lot of them like that.

THE COURT:  You culled through some.  The problem is when they show up, then they have more excuses.

MR. BARLOW:  And, also, probably as soon as a few of them find out they can be excused, then the line keeps growing longer.

THE COURT:  Right, exactly.  Word gets out. And a lot of them, I mean, they just didn't bring it up before.  They should have brought this up.  If it comes out that they're 90 years old and they can't hear, well, it's kind of bad when they're here and you're having to deal with them.  I mean, some people were certainly excused that day because of the lining up; and, so, we

Tonya B. Jackson, RPR-CRR
051972409.654.2833

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 15 of 35 PageID #: 2182

15

already went through a lot of those people before you even started individual voir dire.  So, you get -- there's a big attrition rate.

MR. BOURQUE:  If I may, judge.

THE COURT:  But then I'm saying -- the 200 I'm talking about, those are people who actually survived that cut and actually filled out questionnaires.  So, we had already gotten rid of a bunch of them and, so, you had the questionnaires and we got up to 180 on those to do that.

Go ahead.

MR. BOURQUE:  Well, one of the things I was going to say, judge, assuming that there isn't going to be a severance, which the court is speaking to this morning, it seems to me that obviously we're going to have two defendants in the courtroom, two sets of lawyers at the defense table, the government's side; and I think that -- I know that generally what we try to do is to get that 200 or 250 people in the courtroom one time, get the process started, and then get it started down the track; and I think sometimes -- and I -- just a thought.  I think that if we begin voir dire at the scheduled time, we might want to think in terms of two waves, where you bring that first set of veniremen in in their pool and then you have a second wave on reserve.  If we happen to

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 16 of 35 PageID #: 2183
Caucus Conference

16

work our way through the entire pool and not fill our juror box, then we bring in a second wave and begin anew to fill out what's left.

And it's just a thought. But I do believe -- because there are going to be issues that are going to surface that are not going to be solved by giving the defense two extra peremptories and then -- and I'm just guessing at that, but everything that seems simple in the practice of law winds up to be more complicated in its application. So, I think that we should be prepared to maybe do it in two waves. We can still do everything on time and timely through the system the way it is now but just set it up in sort of a two-wave concept.

If we get through that first 200 and we've got them in the box, we're good to go, the next group -- the second wave never comes; but if we don't have enough, then we can be prepared to go from there. I mean, I think that -- my experience has been the court works very hard on these cases; the lawyers are ready; and once you get started and we get moving, we go. But I think that might be a good idea.

THE COURT: Well, the problem is -- that's not going to work because you've got to exercise all your peremptories at once. I mean, the challenge for cause people, that's who trickle through. I mean, you don't do

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 17 of 85   PageID #: 9184
Status Conference

17

the peremptories until we get through with all those people.  So, you're thinking we have two waves and then we get rid of all the challenge for cause people and then we do peremptories?

MR. BOURQUE:  Well, I think that we need to be just open to the concept.  If we get through the first 200 and we haven't used all our peremptories and they haven't used all theirs and we only have eight in the box -- you understand what I'm saying -- that we may --

THE COURT:  Well, you don't have anybody in the box.

MR. BOURQUE:  I understand.

THE COURT:  It's just like those people who have passed through cause scrutiny but --

MR. BOURQUE:  I understand.  But on our side, we're kind of keeping a tally as we're going along, you know.  So, we kind of have an idea of where we are; and we just have to, you know, try to work with both sides toward the middle in an effort to accommodate the court so that you don't stuff 300 people in a 200 box.  That's all I'm trying to --

THE COURT:  No, we can't do that.  That's -- but it's my concept with the two waves that the two waves happen the same day, sort of like, you know, aftershock or something; but it's the same day in another courtroom.

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 18 of 35 PageID #: 9185
Status Conference

18

MR. BOURQUE: And I'm not opposed to that. I'm just thinking --

THE COURT: But it's going to be kind of exhausting because the first one -- and I think it takes maybe -- and you probably know better than I how long it takes for that first day. It's like an hour, hour and a half or so when they show up and we just say some general things and then they break up and fill out their questionnaires after lunch; and that's when the people start coming in with excuses. But it takes a long time just to get them assembled here and they get photographed and they get arranged in order and things like that.

But I think Ms. Harper thought we could do -- what were you -- we were discussing this yesterday. What was your --

MS. HARPER: We would still do the 200 in Judge Heartfield's courtroom and the second voir dire we could do in here and we could at least put 50. So, you would have 250 on the original strike list.

THE COURT: But you would have to -- maybe we would start earlier for the first group. Of course, that's hard because it takes a while to get them --

MS. HARPER: It takes a while for them to get the pictures and for them to be seated in the courtroom.

THE COURT: So, right after we do that, then

Tonya B. Jackson, RPR-CRR
051976 409.654.2833

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 19 of 85 PageID #: 2186

Status Conference

19

everybody comes down here; and we do the next group.

MS. HARPER:  The next grouping, yes.

THE COURT:  And then everybody -- the first people have already gone to lunch, and these people go to lunch --

MS. HARPER:  And we'll just tell them where to come back to fill out that second juror questionnaire and then turn it in --

THE COURT:  We've got to eat lunch really fast.  Okay.  And then they've got to come back that day.

But I guess my question is, assuming it's not severed, what -- how many peremptories more are we talking about?  Because 50 won't give that many more.  I mean, it's some more.  But what -- what did you have in mind?

MR. BOURQUE:  Well, until --

THE COURT:  And I went to a workshop on this, and things went all -- across the board.  Some people got absolutely no extras.  Some people got some extras when they -- and a lot of people tried defendants together.  I mean, I know we've already severed here; but that has not really been the practice that I saw across the country.

MR. MORROW:  Judge, the only problem for us answering the question is -- we want to try to, but it's so dependent on the panel we have in front of us.  So,

Tonya B. Jackson, RPR-CRR
051977409.654.2833

Case 1:13-cv-00724-MAC-CLS   Document 146-2   Filed 01/25/23   Page 31 of 81 PageID #: 9187

Caucus Conference

20

the way I've always been taught to do it is however many challenges for cause we make that you don't grant, that's how many peremptories we're going to ask for.  So --

THE COURT:  Well -- but no.  You've got to ask for them ahead of time.  It's not going to work that way. It's like you were told you've got 20 ahead of time by the rules.  We're not just going to do it, "Oh, well, now I want -- now I'm going to get ten more."  No.  We're going to do this ahead of time and decide so we can get enough people here to deal with this.

MR. MORROW:  But, judge, we -- not to argue with the court, but we have to be able to respond to what happens in the courtroom and if we think we made a valid challenge for cause and you deny it, we're going to be asking for a peremptory on that basis.

THE COURT:  Well, okay, but no, you're not going to be asking for any more.  You're going to get a set amount -- well, you're not going to get it.  I mean, you -- I can give you 25 peremptories to start with, and that's it.  I mean, I don't care.  There may be some people you want to get rid of, but you can't do that.

MR. BOURQUE:  Well, I was thinking half again as many, as opposed to 25, 30.  And the problem is you give us 25, which one of us gets 13?

THE COURT:  26.

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 21 of 85   PageID #: 9158

Status Conference

21

MR. BOURQUE:  30 is a good round number.

THE COURT:  I thought about 30.  I think the problem with 30 is I don't even know with the supplemental 50 will that be enough to do that.

I don't know if the government has any idea about that.

MR. BARLOW:  The only other thought I have, your Honor, is we can -- it's a grueling day that first day, but it's not something we haven't gotten through before a number of times.  We could do it twice, just replicate it the next day.  Have one pool one day where we can do it and the next pool the next day and we'll have all the people we'd need like that, could possibly need.

MR. BLACK:  That may be something for the court to consider, your Honor, because if the case is not going to be severed, I would not be opposed to do it in two waves.  Have Ms. Harper bring in -- do the normal routine on Day 1 and then on the second day she summons the second group of people and basically we're doing the same thing to be sure that we have a sufficient number, even though I -- I think that's the safe way to do it and I think it would be easier on Ms. Harper and the court if we were to split it up into two separate days as opposed to trying to bring in a whole lot of people on that one

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 33 of 81 PageID #: 9189

Status Conference

22

marathon day.

THE COURT:  We have two kind of marathon days.
Okay.  But then you would have to have 400 people.

Are you going to have enough to be able to
have 400 people show up?

MS. HARPER:  Well, I mean, we're just in the
beginning.  We can actually bump up the number of
questionnaires we're going to send out.  That's not a
problem.

MR. BLACK:  Correct.  So, I think that's
something that -- you know, unless Ms. Harper has
something that she thinks might be a better idea based on
what she's heard from a procedural standpoint or if she
has some ideas -- if there's something that she thinks
that we've talked about is not workable, then I think we
should listen from her; but if she thinks we could
possibly do it in two waves, identical days, Day 1,
Day 2, with two different groups, that would ensure that
we would have a sufficient number of people.

As far as number of peremptory challenges,
once again, that's not something that I was really
prepared to discuss today but I think it is something
that needs to be addressed sooner as opposed to later and
I think somewhere --

THE COURT:  That's why we have to talk about

it now, because this is something that she --

MR. BLACK:  Yes, something around -- and I think that gets into the number of people.  And regardless of the court's final decision, if we were to do it two separate identical days in two waves, that would eliminate any potential problems; but I think somewhere around the neighborhood of 30 would be something to consider.  And if we run into unforeseen circumstances, I mean, obviously the defense can always request additional; and that would be up to the court at that time to grant it or not grant it.

But I do understand the court's preference to coming up with a set number, whether it be 30 -- and that's our starting point and maybe the ending point.  And we can always request more if something unforeseen happens or new developments.

THE COURT:  What's the government's position on this?

MR. BATTE:  Your Honor, as I'm sure you can predict, the government's position is that we don't want any more peremptories.  So, my suggestion would be -- and I agree with Mr. Morrow's -- what he suggested, which is you really don't know how many peremptories you really should get until after the jury selection.  You ask for additional peremptories at the end of the voir dire.

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 35 of 81 PageID #: 10670

24

So, my suggestion would be similar to what Mr. Black stated, that we add more -- we front load more jurors at the beginning.  If we have to do it in two days and bring 400 in so that we're sure that it -- if it's 30 peremptories -- it may be more.  I hope it's going to be less, but at least that way it would be covered.  But I don't think that right now is the right time to decide how many additional peremptories.

THE COURT:  Well, right now is when the court is going to decide.  So, it may not be your time; but it's my time because it affects what we do, as to how many we get.

MR. BATTE:  I understand.  You asked what our position was, and that's what it is.

THE COURT:  Okay.  That's good.  All right.  That's your position.  I think you should have availed yourself of some peremptories that you didn't use before.  So, anyway -- maybe you don't want more.  I think more would be good.

MR. BOURQUE:  The way we have the perfect solution, the government gets 20, the defense gets 30.

THE COURT:  That's not going to work.  You're going to get the same number whether you want it or not.

MR. BATTE:  Your Honor, on the issue of severance, I would -- I know that we have -- and we

agreed to put back our motions but we don't have a status conference scheduled until February and that would be at this time the first time that the court would be considering a severance. Obviously it's going to have to have a hearing. We would ask that you move that timetable at least for a severance up because we've got potentially a hundred witnesses to get together on punishment in this case; and if you do sever the case out, then obviously probably about half of those punishment witnesses we won't need for May. And I would ask the court to consider moving the deadline for deciding the severance issue up so that we're not in a position where, you know, we're scheduling people to come in and then we have to stop.

I don't know how complicated the severance issue is; but I would ask that that particular motion, if you could keep it at the regular deadline, and then perhaps set before the first of the year a hearing on the severance issue in case you do decide to grant it. Then we all -- obviously we'd have to put any scheduling order and everything else in effect.

MR. BLACK: Your Honor, I agree with what Mr. Batte is saying. In fact, I think a severance motion is part of what I conceive as the guilt/innocence motion. I think the severance motion should be one of those filed

Case 1:13-cv-00724-MAC-CLS   Document 146-2   Filed 01/25/23   Page 37 of 81 PageID #: 9193

Status Conference

26

on or before the December 9th deadline that we've already talked about.

THE COURT:  Can you do it by the November 9th deadline?

MR. BLACK:  Probably not, but I think it would not be that long after.  In fact, I think we can probably have it done with a 2-week extension on that particular motion as opposed to a 30-day extension.  We could probably get it done before December the 9th, but --

THE COURT:  Okay.  November the 23rd.  That sounds Thanksgiving-ish.  I don't know.  When --

MR. BLACK:  Because I do think that's part of the motion, and just in the last --

COURTROOM DEPUTY:  It's a Monday, the Monday before Thanksgiving.

THE COURT:  Okay.  Well, let's do that deadline, November 23rd for the severance motion.

MR. MORROW:  It's good.

THE COURT:  Like that?

Okay.  And then I can set a hearing sometime after that.  Obviously I want responses.  I know I've got a Sherman case in December, and my daughter is having surgery.  So, I've got days that I won't be available; but we can have a hearing sometime then.

MR. BLACK:  And that's a priority motion, your

Case 1:13-cv-00724-MAC-CLS  Document 146-2  Filed 01/25/23  Page 38 of 81 PageID #: 9194

Honor, from our perspective I think that we're working on and based on some of the discovery that we've recently received and some other information we've received through our own investigation and that's coming together, but that would be part of our severance motion that we're presenting to the court.

THE COURT:  Okay.

MR. BLACK:  So, we'll have that timely done.

THE COURT:  Okay.  Well, considering I'm not inclined to that right now, I'm not saying I won't do it. I'll consider that.

But the other impact is on what we do right now.  So, I think Ms. Harper needs to get more people, thinking -- if we don't sever -- I like the two-day approach, the *déjà vu* approach of that, and probably 30 peremptories per side.

Mr. Batte doesn't have to use them all, but that's what I think would be appropriate.

MR. BATTE:  That's fine, judge.  Did you set a deadline -- did you set a deadline for the motion to sever?

THE COURT:  Right.  That's November 23rd.

MR. BATTE:  Okay.  I can have that motion done in seven days or less, if you need it in less.

THE COURT:  Well, obviously the sooner the

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 39 of 81 PageID #: 9195

Status Conference

28

better because I'm not going to schedule a hearing until I have it.

MR. BATTE: Okay.

THE COURT: But right now that -- the Sherman trial is scheduled for what date?

COURTROOM DEPUTY: December 7th.

THE COURT: December 7th. And I have to do something -- some judicial conference committee meeting in Tucson the first three days of December. So, it's like it gets bad. And then my daughter is having surgery. But we'll figure out some day.

MR. BATTE: Okay.

THE COURT: But it may be really close to Christmas.

MR. BATTE: For the hearing, you mean?

THE COURT: Uh-huh, for the hearing.

MR. BATTE: That's fine. The other responses I don't think you stated but I presume that since you're moving the other motion deadlines for the defense to December -- from November 7th to December 7th -- our responses were due November 30th. So, our responses would be due December 30th? Is that --

THE COURT: Well, I moved it from November 9th to December 9th.

MR. BATTE: Right.

Tonya B. Jackson, RPR-CRR
051986 409.654.2833

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 29 of 35 PageID #: 1196
Status Conference

29

THE COURT:  Okay.  November 30th was -- your response to guilt/innocence motions was November 30th.  So, is December 30th --

LAW CLERK:  It's a Wednesday.

THE COURT:  December 30th?

COURTROOM DEPUTY:  Is a Wednesday.

THE COURT:  That's fine.

MR. BATTE:  Okay.

THE COURT:  Okay.  Anything else we want to talk about with regard to scheduling?

And I'll do an order that will fix -- will set the severance motion deadline and then -- okay.

Now, when did you say you want to do -- November -- yeah, that's severance motion response -- no, severance motion is going to be filed by November 23rd.  So, when is the deadline for -- when do you want to respond to the severance motion?

MR. BATTE:  November 30th.

THE COURT:  Is that a business day?

COURTROOM DEPUTY:  Monday.

THE COURT:  Okay.  So, we have the severance motion filed November 23rd -- or you can file it sooner -- and then the response would be due November 30th.

And then the other motions December 9th and

Tonya B. Jackson, RPR-CRR
051987409.654.2833

Case 1:13-cv-00724-MAC-CLS Document 146-2 Filed 01/25/23 Page 41 of 81 PageID #: 11197

30

the -- then December 30th on the responses to that.

Okay.  Anything else?

MR. MORROW:  Judge, before you break for the morning session, we would ask if you would give us a few minutes *ex parte* this morning.  We think it would make things go easier later on if you would give us a few minutes to meet with you.

THE COURT:  Okay.  Anything else before we --

I think, Ms. Harper, that gives you more idea to like get lots of people.

MS. HARPER:  That's fine.

THE COURT:  Yes.  That'll make your work busier, but -- okay.  I think you can step down.

MS. HARPER:  We're at the very beginning; so, that's fine.

THE COURT:  Okay.  All right.

MR. BARLOW:  May I bring up one issue, your Honor?

THE COURT:  Yes.

MR. BARLOW:  Regarding the peremptory challenges.  I was reading the statute.  I think the statute says the court may allow additional peremptory challenges to multiple defendants, but I don't think it addresses allowing additional peremptory challenges to the government.

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 31 of 35 PageID #: 1198
Caucus Conference

31

THE COURT: Well, you can brief that. I think anytime I add peremptories for one side, I add it to the other side as well.

MR. BLACK: I've never had that particular issue come up, your Honor. I've just never seen the prosecution, or the government, allowed additional peremptory challenges. I think the statute or the rule only speaks to the defendant, but I'll see what kind of case law I can come up with that deals with that.

THE COURT: Okay. Well, the government may not want more. I don't know.

MR. BLACK: They may want less. I don't know, but -- but we'll see.

THE COURT: But generally I try to equalize it. Maybe I've been doing that and no one complained but --

MR. BLACK: In a civil case, I think -- I've seen that done in civil cases before but in a criminal case, I think we're dealing with a different rule and a different statute and I think that's why the statute only deals with additional peremptory challenges to the defense and the prosecution is not allowed any.

THE COURT: That may be right.

MR. BARLOW: Your Honor, I believe the logic behind that is the reason the additional peremptory

Tonya B. Jackson, RPR-CRR
051989 409.654.2833

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 32 of 35 PageID #: 10678
Status Conference

32

challenges, when there are multiple defendants, are allowed is because sometimes we have competing interests and different interests in what type of juror we want to select; but the government has the same type of interest in its jury selection process. So, there's no logic for the government to need additional challenges just because there are multiple defendants.

MR. BATTE: And all that makes sense, judge. What I can tell you is I will research this matter; and if we're not entitled to it, we won't ask for any.

THE COURT: Okay. Just let me know.

All right. Anything further?

MR. BOURQUE: I -- as long as they've brought it up, what I have seen is they're not given the identical number we're given. If you give the defense side 30, that's basically 15 for Mr. Snarr and 15 for Mr. Garcia, if you sort of do the math that way. What I have seen happen, instead of giving the government the same 30 that the defense side has been given, is they're given like 22. They're given maybe a couple more or three more, but they're not given that identical --

THE COURT: I'll research this whole issue. I mean, that makes sense when you have a regular criminal case where the defense has more than the government to start with; and, so, you would not -- if you got extras,

you wouldn't have the same amount.  So, I don't -- we'll research this and do the right thing.

MR. BOURQUE:  Thank you, judge.

THE COURT:  Okay.  But I encourage you to research it as well.

Okay.  Anything else?

MR. BATTE:  No, your Honor.

MR. MORROW:  No, your Honor, not from us.

THE COURT:  Anyway, I still think it's a good idea for Ms. Harper to get a lot of people out there and we can decide later what we're going to do about it, but having the pool built up enough would be good.

Okay.  If there's nothing further, then I guess you're excused on this part.

And then if you want to meet in chambers -- just the lawyers in chambers?  Is that what you want to do this morning?

MR. MORROW:  Yes, your Honor, please.  With this group of lawyers (indicating), not that group of lawyers.

THE COURT:  Right, I understand.

MR. MORROW:  Okay.

THE COURT:  Okay.  Thank you.

(Recess, 10:49 a.m. to 11:08 a.m.)

(Open court, counsel for defendants and

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 34 of 35   PageID #: 9101
Status Conference

34

defendants present, counsel for government not present)

THE COURT:  All right.  I think counsel wanted to put on the record some comments about this afternoon's proceedings.

MR. BLACK:  Yes, your Honor.  Patrick Black on behalf of Mr. Snarr.  It is our position, your Honor, that the subject matter that we're dealing with this afternoon, specifically the case budget for the two defendants, is not a critical stage of the proceedings and, therefore, the defendants do not have a constitutional right and it is not required for them to be physically present at the court's hearing this afternoon.

In addition to that, my client, Mr. Snarr, is willing to forego any right that he would have, if any, to be here; and he's willing to be transported back to Houston today.  So, we would ask that Mr. Snarr be allowed to not be in attendance this afternoon and that he be allowed to return to his place of incarceration in Houston, Texas.

THE COURT:  All right.  Mr. Snarr, do you have a problem with that?

DEFENDANT SNARR:  No.

THE COURT:  All right.  That's granted.

MR. MORROW:  Judge, we would make the same

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 35 of 35 PageID #: 9102
Status Conference

35

request for Mr. Garcia on exactly the same basis. We've reviewed the matters that will be going on this afternoon, and we'd ask that he be excused to return to Houston.

THE COURT: All right. Mr. Garcia, is that acceptable to you?

DEFENDANT GARCIA: Yeah, that's okay.

THE COURT: All right. Very well. That will be done.

MR. BLACK: Thank you, your Honor.

THE COURT: So, we'll see you this afternoon.

MR. MORROW: Judge, we hadn't quite completed --

THE COURT: Oh, okay. Well, go ahead and -- we'll see you in chambers in a moment.

MR. MORROW: Yes.

THE COURT: Okay.

(Proceedings adjourned, 11:10 a.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, AUGUST 9, 2010, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/ Tonya Jackson
TONYA JACKSON, RPR-CRR

Tonya B. Jackson, RPR-CRR
051993 409.654.2833

# Attachment 4

 **Gmail**

**Rob Lee <roblee@vcrrc.org>**

## Response to Letter - June 30, 2020

1 message

**Terri Splawn** <Terri_Splawn@txed.uscourts.gov>                    Tue, Nov 3, 2020 at 4:33 PM
To: "roblee_vcrrc.org" <roblee@vcrrc.org>
Cc: Beth Harper <Beth_L_Harper@txed.uscourts.gov>

Mr. Lee,

I am writing this email in response to your letter to the Clerk dated June 30, 2020. I apologize for the length of time it has taken.

28 U.S.C. § 1861 establishes that grand and petit juries be selected at random from a fair cross section of the community in the district or division wherein the court convenes, and 28 U.S.C. § 1862 prohibits discrimination in the selection process. District Judges have broad authority. Having a separate wheel for death penalty cases is not unusual as the numbers needed to seat a jury in a capital case can deplete a current wheel. Separate wheels use the same random selection process and meet the requirements of the Federal Rules. Our jury wheels are built as described in the Plan for Random Selection of Jurors and created by the company who has the current contract with the Court. In 2009, Sutera Data Systems was the contract holder and their response to your request was previously provided.

Attached is the list of the master wheel from which the petit jury for the defendant's 2010 trial was selected. This was previously sent to you on a CD that you said was "unreadable" by your office. We are also providing you with a copy of our court's Jury Plan from 2009, along with gender reports, and pool reports.

You are welcome to visit the Beaumont Courthouse to review and make copies of questionnaires or other public documents. If you have any questions, please feel free to call me.

Thank you,

Terri

Virginia Capital Representation Resource Center Mail - Response to Letter June 30, 2018



**Terri Splawn**
Operations Manager
United States District Court
Eastern District of Texas
(903) 590 - 1060

---

**8 attachments**

June302018letterRobertLee.pdf
639K

SnarrPoolReport462010.pdf
357K

GenderReport109cr15.pdf
77K

SnarrPoolReport472010.pdf
208K

SnarrGarciaQualifiedReport.pdf
2503K

GenderReportGJ.pdf
38K

DaveMalandsresponse.pdf
151K

Amended3262009AppendixEJuryPlan.pdf
515K

Attachment 5

Case 1:13-cv-00724-MAC-CLS   Document 146-2   Filed 01/25/23   Page 51 of 81 PageID #: 10686

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

UNITED STATES OF AMERICA | DOCKET NO. 1:09CR00015
|
| MARCH 29, 2010
VS. |
| 10:26 A.M.
|
MARK ISAAC SNARR AND |
EDGAR BALTAZAR GARCIA | BEAUMONT, TEXAS

----------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 48

REPORTER'S TRANSCRIPT OF FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

----------------------------------------------------------

APPEARANCES:

FOR THE GOVERNMENT:      JOSEPH ROBERT BATTE
                        KERRY KLINTWORTH
                        ANTONETTA STANCU
                        U.S. ATTORNEY'S OFFICE
                        350 MAGNOLIA
                        SUITE 150
                        BEAUMONT, TEXAS 77701


FOR DEFENDANT GARCIA:   ROBERT A. MORROW, II
                        ATTORNEY AT LAW
                        24 WATERWAY AVENUE
                        SUITE 660
                        THE WOODLANDS, TEXAS 77380

                        GERALD E. BOURQUE
                        ATTORNEY AT LAW
                        24 WATERWAY AVENUE
                        SUITE 660
                        THE WOODLANDS, TEXAS 77380

Tonya B. Jackson, RPR-CRR
052567 409.654.2833

Case 1:13-cv-00724-MAC-CLS Document 146-3 Filed 01/25/23 Page 52 of 81 PageID #: 10687

FOR DEFENDANT SNARR:      GEORGE PATRICK BLACK
                          FEDERAL PUBLIC DEFENDER
                          110 NORTH COLLEGE
                          SUITE 1122
                          TYLER, TEXAS 75702

                          DOUGLAS MILTON BARLOW
                          ATTORNEY AT LAW
                          485 MILAM
                          BEAUMONT, TEXAS 77701


COURT REPORTER:           TONYA B. JACKSON, RPR-CRR
                          FEDERAL OFFICIAL REPORTER
                          300 WILLOW, SUITE 239
                          BEAUMONT, TEXAS  77701



   PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
  TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

Case 1:09-cr-00015-MAC-KFG Document 362 Filed 10/06/10 Page 45 of 48 PageID #: 1582
Final Pretrial Conference

45

is still admissible."  But they're still providing it to us.

THE COURT:  I mean, you can bring something; but I think you know where the court is coming on all this, because that's what the law dictates that the court has to do.

MR. MORROW:  Yes, your Honor.

THE COURT:  Okay.  I guess we can -- but I really need -- it's a pending motion I really need to resolve.  I'm going to deny it, but it's without prejudice.  You could -- if there's something that comes to your attention, you can bring it up again.

MR. MORROW:  Thank you, judge.  We'll do that.

THE COURT:  Okay.  All right.  Well, that kind of -- I think that's everything that's pending, then.

MR. MORROW:  We did have a request for some *ex parte* time with the court.

THE COURT:  Okay.

MR. MORROW:  When it's permissible.

THE COURT:  Okay.  Is there anything else?

MR. BATTE:  Your Honor, I wanted to, on the record, tender a copy of the indictment and the venire list to both defendants, as required under statute.

THE COURT:  All right.

MR. BATTE:  And if you would, let the record

46

reflect that they have received that.

THE COURT:  Yes, the record will so reflect.

MR. BATTE:  Thank you.  That's all I have, your Honor.

THE COURT:  All right.  Is there anything else?

MR. MORROW:  Not from Mr. Garcia, your Honor.

MR. BARLOW:  Nothing further from Mr. Snarr, your Honor.

THE COURT:  All right.  And we're going to have six alternates.  It's going to be a challenge where to stick them, but I -- on the first one I did, we had that.  We had, I think, two people at the end down there; and then there was, like, four clustered there (indicating).  But I know there are going to be a lot of marshals around, too.  So, it's going to be really cozy with a lot of people.  May be some people back here (indicating).

Do you have anything?

THE MARSHAL:  Just a question for the marshals right quick.  I know we got a witness list from the defense the other day that included quite a few more in-custody witnesses.  Just needed to know status on writs on those.

MR. BOURQUE:  That's probably something we

# Attachment 6



## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS

**David J. Maland**                211 WEST FERGUSON, ROOM 106                (903) 590-1008
U.S. DISTRICT CLERK                 TYLER, TEXAS 75702

Mr. Andrew Goodman
Louisiana Capital Assistance Center
636 Baronne Street
New Orleans, LA 70113

**Re:  Request for Jury Records Pursuant to 28 U.S.C. §1868**

Dear Mr. Goodman,

I am writing in response to your letter dated June 20, 2014 requesting jury records.  I am including several records with this letter that my staff and our vendor of jury wheel services, Sutera Data Systems of Tobyhanna, PA, were able to copy and download to CD.  However, there were several items requested that are too voluminous and must be viewed at the Jack Brooks Federal Building in Beaumont, Texas.

Here is the list of your requests with our comments:

1.  The 2006, 2008, 2010 and 2012 Master Jury Wheels for the Beaumont Division. **(Included with this correspondence on CD).**

2.  The voter rolls from which names for the 2006, 2008, 2010 and 2012 Master Jury Wheels for the Beaumont Division were selected. **(Included with this correspondence on CD).**

3.  The certificates prepared and executed by the persons who randomly selected names for the 2006, 2008, 2010 and 2012 Master Jury Wheels for the Beaumont Division. **(Not available. This certificate was originally prepared by Sutera Data Systems).**

1

4. A brief description of the software employed in the selection process. **(Included with this correspondence).**

5. All qualification forms used in producing the Beaumont Division's 2008 Qualified Jury Wheel, including, but not limited to qualification forms returned as undeliverable, completed qualification forms of those placed in the Qualified Jury Wheel, and qualification forms of those exempted from jury service with the statement of the Clerk as to why such persons were exempted. **These would be actual paper questionnaires that are in storage at the Beaumont Courthouse and can be viewed at that location.**

6. Any written policies from 2006 to the present relating to excluding persons from the Beaumont Division's Qualified Jury Wheel. **Questionnaires are coded as outlined in our Jury Plan on our website. The plan states how we disqualify and excuse in our district.**

7. The 2006, 2008, 2010, and 2012 Qualified Jury Wheels for the Beaumont office. **This basically is the same information that is run as answered in question 13.**

8. Any orders directed to the Marshal between 2006 and the present, requiring the Marshal to summon petit jurors in the Beaumont Division in the event of an unanticipated shortage of available petit jurors drawn from the Qualified Jury Wheel, pursuant to Section 9(c) of the Jury Plan; and the list of any jurors so summoned. **We have never had to use the Marshal for shortage of jurors.**

9. All petit jury venires drawn from the Beaumont Division's 2008 Qualified Jury Wheel (with names and identifying information redacted, if necessary). **This information is stored at the Beaumont Courthouse and can be made available for inspection.**

10. Any petit jury summons for person drawn from the Beaumont Division's 2008 Qualified Jury Wheel returned as undeliverable. **This information is stored at the Beaumont Courthouse and can be made available for inspection.**

11. All grand jury venires drawn from the Beaumont Division's 2008 Qualified Jury Wheel (with names and identifying information redacted, if necessary). **This information is submitted with this correspondence.**

12. Any grand jury summonses for persons drawn from the Beaumont Division's 2008 Qualified Jury Wheel returned as undeliverable (with names and identifying

2

064208

information redacted, if necessary).  **This information is submitted with this correspondence.**

13. All AO-12 or JS-12 reports relating to the jury compositions of the Beaumont Division created since 2006, and all papers and information that were used to create such reports.  **(Included in this report are the JS12 "Entire Source List" and the "Qualified List" Report from the 2007 Jury Wheel,  JS12 "Entire Source List" Report from the 2013 Jury Wheel, and the JS12 "Entire Source List" and  the "Qualified List" from the 2014 Jury Wheel.**

In regards to copy and research fees, a one-time record research fee of $30.00 for the materials on the enclosed CD is due and payable to the United States District Court, Eastern District of Texas.  Please send a check in that amount to:  U.S. District Clerk, 211 West Ferguson, Room 106, Tyler, TX  75702  attn:  Dave Maland.  Please contact me if you have any questions about this.

Sincerely,

David Maland

David J. Maland
U.S .District Clerk, Texas Eastern
Ph. 903-590-1008

3

4

064210

# Sutera Data Systems

1642 Route 196
Tobyhanna, PA 18466
(570) 216-4666 Fax (570) 241-9413
Email Msutera@ptd.net

**July 8, 2014**

Ms. Terri Hoskins
Jury Coordinator
U.S. District Court
Eastern District of Texas
211 W. Ferguson  RM 106
Tyler, Texas 75702

Dear Terri Hoskins:

Attached is a CD which contains items 1 and 2 of Mr. Andrew Goodman's June 20, 2014 memo requesting Jury Records.

The Master wheel data is in the JMS upload format delimited by ~ and the Voter data is in a fixed text file (record layout attached).

In regard to Item-4, I have attached a brief descript of the software employed in the selection process.

If you should have any questions, or if I may be of any assistance, please contact me.

Sincerely;

MICHAEL SUTERA
Computer Specialist

Attachments:

064211

ITEM-4

The software utilized to create the Court's Master Jury Wheel is written in FoxPro. This software has evolved from a standalone DOS application to what is how Microsoft Visual FoxPro.

FoxPro is the object-oriented relational database management system that makes it possible for you to create database solutions for the desktop to the Web. Visual FoxPro provides powerful data handling capabilities, rapid application development tools for maximum productivity, and the flexibility needed to build all types of database solutions.

For the 2006 and 2008 Master Wheels a stating and increment number was used to select the names for inclusion into the wheel.  Starting in 2010 the purely random method was used.

In the Purely Random selection method, a list of random numbers (equaling the number of names to be selected for a county) is generated and every record on the Voter list equaling those numbers is selected.

Example;

| Voter list | Selected | Random Number list |
|---|---|---|
| 1st name | No | 3 |
| 2nd name | No | 6 |
| 3rd name | Yes | |
| 4th name | No | |
| 5th name | No | |
| 6th name | Yes | |

The list of random numbers is generated by utilizing the FoxPro Random number generator function.  The FoxPro Random Number function utilizes a algorithm taken from the "Handbook of Mathematical Functions, National Bureau of Standards, June 1964.
Equation 26.2.23, page 933. Its error is < (4.5E-4 * std)

vrl layout.txt

```
Structure for database: F:\EDTX9\VRL.DBF
Number of data records: 1993105
Date of last update   : 05/01/09
Code Page             : 0
Field  Field Name  Type         Width    Dec    Index  Collate
    1   CNTY        Character        3            Asc    Machine
    2   VID         Character       14
    3   SNME        Character       50
    4   GNME        Character       50
    5   MID         Character       50
    6   FORMSNME    Character       50
    7   SUF         Character        4
    8   SEX         Character        1
    9   DOB         Character        8
   10   HSE         Character        9
   11   DESGIN      Character       12
   12   DIRPRE      Character        2
   13   STR         Character       50
   14   STRTYPE     Character       12
   15   STRDIR      Character        2
   16   UNIT        Character       12
   17   UNITTYPE    Character       12
   18   CITY        Character       50
   19   ZIP         Character        9
   20   MADR1       Character      110
   21   MADR2       Character       50
   22   MCITY       Character       50
   23   MSTATE      Character       20
   24   MZIP        Character       20
** Total **                        651
```

Page 1

064213

copy.txt

VRL records copied;

    287,571 Records copied for 2006

    271,110 records copied for 2008

    298,885 records copied for 2010

    270,459 records copied for 2012

064214

Attachment 7

| From: | Jason Hawkins |
|---|---|
| To: | Richard Bourke; roblee_vcrrc.org |
| Subject: | FW: Records in Edgar Garcia / Mark Snarr case |
| Date: | Wednesday, January 15, 2020 11:30:04 AM |

Once I receive it I will fedex  it to you so hopefully it will be there Friday.

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 fax
http://txn.fd.org
Jason_Hawkins@fd.org

**From:** Beth Harper <Beth_L_Harper@txed.uscourts.gov>
**Sent:** Wednesday, January 15, 2020 11:29 AM
**To:** Jason Hawkins <Jason_Hawkins@fd.org>
**Subject:** RE: Records in Edgar Garcia / Mark Snarr case

Jason,

I retrieved the records from storage.  The jury wheel for the Snarr/Garcia case was from 11/10/2009 participant numbers 1746379 – 1748578, I will be federally expressing you a copy of the cd as you requested.

Beth Harper

**From:** Jason Hawkins <Jason_Hawkins@fd.org>
**Sent:** Monday, January 13, 2020 12:18 PM
**To:** Beth Harper <Beth_L_Harper@txed.uscourts.gov>
**Subject:** FW: Records in Edgar Garcia / Mark Snarr case

Beth,

I hope you are well!  We are under a little time crunch and I was hoping you had found some time to get the records from storage.  Is there anything I can do to help?

Thank you,

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 fax

133456

http://txn.fd.org
Jason_Hawkins@fd.org

---

**From:** Jason Hawkins
**Sent:** Tuesday, January 7, 2020 12:38 PM
**To:** 'Beth Harper' <Beth_L_Harper@txed.uscourts.gov>
**Cc:** RBourke_thejusticecenter.org <RBourke@thejusticecenter.org>; roblee_vcrrc.org
<roblee@vcrrc.org>
**Subject:** RE: Records in Edgar Garcia / Mark Snarr case

No worries!  Thank you!

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 fax
http://txn.fd.org
Jason_Hawkins@fd.org

---

**From:** Beth Harper <Beth_L_Harper@txed.uscourts.gov>
**Sent:** Tuesday, January 7, 2020 12:37 PM
**To:** Jason Hawkins <Jason_Hawkins@fd.org>
**Cc:** RBourke_thejusticecenter.org <RBourke@thejusticecenter.org>; roblee_vcrrc.org
<roblee@vcrrc.org>
**Subject:** RE: Records in Edgar Garcia / Mark Snarr case


Hi Jason,

I have this on my list, I was out the last two weeks in December, and I will need to pull the
records from storage, can you give me some time and I will email you with the numbers.  If
you need to call me, my number is 409-654-7004.

Thanks and sorry for the delay.
Beth

**From:** Jason Hawkins <Jason_Hawkins@fd.org>
**Sent:** Tuesday, January 7, 2020 12:34 PM
**To:** Beth Harper <Beth_L_Harper@txed.uscourts.gov>
**Cc:** rbourke_thejusticecenter.org <RBourke@thejusticecenter.org>; roblee_vcrrc.org
<roblee@vcrrc.org>
**Subject:** FW: Records in Edgar Garcia / Mark Snarr case

Ms. Harper,

133457

I just wanted to follow up on my email from December 19. I know it came during the holidays, but I wanted to circle back and see if you had time to follow up on my questions.

Thank you!

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 fax
http://txn.fd.org
Jason_Hawkins@fd.org

---

**From:** Jason Hawkins
**Sent:** Thursday, December 19, 2019 9:13 AM
**To:** 'Beth Harper' <beth_l_harper@txed.uscourts.gov>
**Subject:** RE: Records in Edgar Garcia / Mark Snarr case

Ms. Harper,
It has been quite some time since we last spoke and I hope the holiday season finds you well! After looking through the material that you were graciously able to provide me I had some questions about the jury list that was used to summon the jurors in this case that I was hoping you might be able to help me with.
 The indictment in the Snarr/Garcia case (09-15) case was handed down on January 21, 2009 and the trial didn't start until April 2010. Based on my reading of the 2014 version of the Eastern District of Texas jury plan I thought jury wheels were only created in even-numbered years, but I may have misunderstood. That is why I originally asked for the 2006, 2008 and 2010 master jury wheels. But after looking through the names of the 308 jurors in the pool there are some gaps and I am not certain which wheel the jurors came from.
From the data already supplied I can see that the master wheels have the following participant number ranges:

- 2006 wheel: participant numbers in the range 100550864 to 100608378.
- 2008 wheel: participant numbers in the range 100899365 to 100967141.
- 2010 wheel: participant numbers in the range 101326379 to 101387861.
- 2012 wheel: participant numbers in the range 101751583 to 101813082.

However, the 308 jurors from whom questionnaires were obtained for the Snarr/Garcia trial have participant numbers in the range 101746664 to 101747520.
Can you tell me what master wheel was used to select the petit jurors for the Snarr/Garcia case? Could we get a copy of that master wheel?
Thank you for any information you can provide!
Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 fax

http://txn.fd.org
Jason_Hawkins@fd.org

---

**From:** Beth Harper <beth_l_harper@txed.uscourts.gov>
**Sent:** Tuesday, July 10, 2018 8:21 AM
**To:** Jason Hawkins
**Subject:** Re: Records in Edgar Garcia / Mark Snarr case

Jason,

I will let the CSO's know that she will be coming, she just needs to ask for me and they can direct her where she needs to go.  I office inside the jury room on the first floor Room 101, our office isn't that big.  My office is on the first floor.  She can park directly across the front doors of the building.



Beth Harper
Jury Administrator
(409) 654-7004

Jason Hawkins---07/10/2018 08:18:07 AM---Beth is going to drive down tomorrow morning and will arrive after 1:00.  She can stay over night an

From: Jason Hawkins/TXNF/05/FDO@FDO
To: Beth Harper/TXED/05/USCOURTS@USCOURTS@USCEXT
Cc: Elizabeth Guemmer/TXNF/05/FDO@FDO
Date: 07/10/2018 08:18 AM
Subject: Re: Records in Edgar Garcia / Mark Snarr case

---

Beth is going to drive down tomorrow morning and will arrive after 1:00.  She can stay over night and come in the following morning if needed.

Thank you!

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 Griffin Street, Suite 629
Dallas, Texas 75202
214.767.2746
214.767.2886 fax
http://txn.fd.org

Beth Harper---07/10/2018 08:10:04 AM---Hello Jason, I have it down on my calendar, do you know what time she might be here tomorrow?

From: Beth Harper/TXED/05/USCOURTS@USCOURTS
To: Jason Hawkins/TXNF/05/FDO@FDO@USCEXT
Date: 07/10/2018 08:10 AM
Subject: Re: Records in Edgar Garcia / Mark Snarr case

---

Hello Jason,

I have it down on my calendar, do you know what time she might be here tomorrow?



Beth Harper
Jury Administrator
(409) 654-7004

▼Jason Hawkins---07/09/2018 10:06:35 AM---Ms. Harper: I hope you are well and had a nice vacation!  I just wanted to confirm that we are still

From: Jason Hawkins/TXNF/05/FDO@FDO
To: Beth Harper/TXED/05/USCOURTS@USCOURTS
Cc: Elizabeth Guemmer/TXNF/05/FDO@FDO
Date: 07/09/2018 10:06 AM
Subject: Records in Edgar Garcia / Mark Snarr case

Ms. Harper:

I hope you are well and had a nice vacation!  I just wanted to confirm that we are still on for our paralegal, Beth Guemmer, to come down to Beaumont on July 11-12 and copy the available jury records from the trial in US v. Edgar Baltazar Garcia and Mark Snarr, 1:09-CR-00015.  The attached letter confirms our original request, but I understand not everything may have been preserved.

Thank you so much for your help on this!

 *(See attached file: Letter_Clerk_EDTX_01252018-signed.pdf)*

Jason D. Hawkins
Federal Public Defender
Northern District of Texas
525 Griffin Street, Suite 629
Dallas, Texas 75202
214.767.2746
214.767.2886 fax
http://txn.fd.org

133460

# Attachment 8

| **From:** | Rob Lee |
| **To:** | beth_l_harper@txed.uscourts.gov |
| **Cc:** | Christine Lehmann; Kathy Nester; Jason Hawkins (Jason_Hawkins@fd.org); Richard Bourke |
| **Subject:** | Garcia v. U.S., Civ. No. 1:13-cv-723 and Snarr v. U.S., No. 1:13-cv-724; juror selection information request |
| **Date:** | Tuesday, June 30, 2020 5:25:08 PM |
| **Attachments:** | 200629 LTR Clerk re Jury info w#.docx |

Ms. Harper:

I am following up on questions about the jury selection process in Garcia's and Snarr's 2010 capital trial and generally, initially raised by Mr. Hawkins. In our investigation of the case, we have developed a number of questions and we hope the answers will help us better understand the information we have learned, and provide additional information and understanding.

Attached is a letter describing some of the information we have learned, and setting out a number of the questions we have developed. We would appreciate you reviewing the letter and letting us know what information you can provide in response to our questions. We have tried to be thorough and clear in drafting questions. If it would be helpful, however, we could coordinate a call in which we might clarify requests as needed, and perhaps address other questions you have.

Thank you very much for your assistance with this matter, and for your previous assistance.

Sincerely,

Rob Lee

2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
(434) 817-2970
(434) 817-2972 (fax)
roblee@vcrrc.org

# ROBERT LEE

LAW OFFICE
2421 IVY ROAD, SUITE 301
CHARLOTTESVILLE, VIRGINIA 22903
(434) 284-3447
roblee@vcrrc.org

June 30, 2020

David J. Maland
U.S. District Clerk
United States District Court
  Eastern District of Texas
211 West Ferguson, Room 106
Tyler, Texas 75702

>     Re:     **Request for jury records pursuant to 28 U.S.C. § 1868 and in support of motion pursuant to 28 U.S.C. § 2255**

Dear Mr. Maland:

Undersigned counsel, along with Federal Public Defender Jason Hawkins in Dallas and the Federal Defender of San Diego, Kathryn Nester, represent Edgar Garcia and Mark Issac Snarr, who were indicted on January 21, 2009 in case number 1:09-CR-15. They were tried in 2010 before a jury, with a guilty verdict on May 7, 2010 and a death verdict on May 13, 2010.  We currently represent the defendants in their proceedings under 28 U.S.C. § 2255 (1:13-cv-724 & 1:13-cv-723). We have previously requested information from your office regarding the jury selection in the defendants' case and your office has provided us some documents and helpful explanations. This letter is written to follow-up on the most recent contact by Mr. Hawkins, and to raise additional questions we have development.

## I.     Request for information to understand issues appearing in the jury selection in *US v Snarr & Garcia*, 1:09-CR-15

We believe that we have identified significant issues in the process of assembling the venire from which the petit jury, and likely the grand jury, were selected.  We wanted to bring this to your attention and also make sure that we are correctly understanding the materials and information your office has supplied thus far.

## II.     Issues identified with assembling of venire in *US v Snarr & Garcia*, 1:09-CR-15

In particular, it appears that:

a. the Master Wheel from which the defendants' petit jury should have been selected was not assembled randomly from the relevant voter roll but by placing voters in order of their Texas VUID and selecting from the top of that list;

b. the defendants' petit jury was not selected from the Master Wheel in place at the time of trial but instead a separate Master Wheel of 2,200 names was drawn from the voter list for the purpose of the defendants' trial;

c. the 2,200-person Master Wheel was not assembled randomly from the relevant voter roll but by placing voters in order of their Texas VUID and selecting from the top of that list (excluding those already selected for the prevailing Master Wheel);

d. the voter registration list used to construct the Master Wheel and the 2,200 Master Wheel appears to include people who registered to vote long after the November 2008 general election;

e. the venire assembled for the defendants' petit jury selection did not reflect a fair-cross-section of the community; and,

f. the venire assembled for the defendants' grand jury selection may not have reflected a fair-cross-section of the community.

## III.    Specific requests for information and relevant documents

With this in mind, we respectfully ask that you investigate and provide answers to the following queries:

### A.    We would like to understand how and why the Master Wheel used for selection of the petit jury venire in the defendants' 2010 trial was selected

1. Can you please explain which list was used as the Master Wheel from which the defendants' petit jury was selected, why that Master Wheel was assembled and how it was assembled from the source list?

2. What Master Jury Wheel and Qualified Jury Wheel was used to select petit jurors for defendant's 2010 trial?

3. Are Master Jury Wheels constructed more often than every two years as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6 paragraph 3? If so, under what authority are these Master Jury Wheels constructed and relied upon?

4. You have previously provided some lists we had requested but it would be extremely helpful to clarify what those documents represent and how they were used in the defendants' cases:
   a. What is the list of 61,483 persons (bea10whl.txt) previously provided by your office and where did it come from?

(1) Why weren't the jurors for defendant's 2010 trial drawn from the list of 61,483 persons (bea10whl.txt) or any of the other master wheels previously supplied by your office (bea6whl.txt, bea8whl.txt, bea12whl.txt)?

b.  What is the list of 2,200 (beauwhl.txt) from which the petit venire in the defendants' 2010 trial seems to have been selected?

5.  Was the list of 2,200 (beauwhl.txt) used to select petit jurors for defendant's 2010 trial?

6.  Please provide a copy of the Master Wheel from which the petit jury for defendants' 2010 trial was selected.

7.  What was the "computer-generated random selection process" used to create the Master Wheel from which the defendant's petit jury was selected?

8.  Could you please explain why you previously advised, in your letter of August 2014, that no certificate from Sutera Data Systems was available for the random creation of the Master Wheels?

9.  In the previously provided materials, ITEM-4, described that "[f]or the 2006 and 2008 Master Wheels a starting and increment number was used to select the names for inclusion into the wheel. Starting in 2010 the purely random method was used." What method was used to select the Master Wheel used in the Snarr/Garcia case?

a.  What were the starting and increment numbers used in the Snarr/Garcia case (if applicable), and also in 2006, and in 2008?

b.  Why was the method changed to "the purely random method" in 2010?

c.  Are any names excluded from the source list before or during the process of random selection?  If so, what is the process for determining the names excluded?

d.  Are any names excluded from the list of names randomly selected from the source list before it is finalized as the Master Wheel?  If so, what is the process for determining the names excluded?

10. What was the file edtx9sp1.doc previously provided on the CD, which we find unreadable?  Can we get a readable copy of the file?

**B.    We would like to understand how and why the 2,200-person Master Wheel was assembled for the defendants' petit jury trial**

11. Could you explain why the list of 2,200 names (beauwhl.txt) previously provided was created under what authority and by what method?

12. If the list of 2,200 persons was used as the Master Wheel for petit jury selection in the defendants' case, was the list of 2,200 (beauwhl.txt) randomly selected from the list of 298,885 persons (VRL2010.txt)?

13. How was the list of 2,200 persons (beauwhl.txt) selected from the list of 298,885 persons (VRL2010.txt)?  What method was used to ensure a random selection?

**C.**     **We would like to understand if there was a special selection made in the defendants' case and, if so, how the special selection worked in this case and how it worked in other cases**

14. Was there a special selection in this case? If so, why?
    a. What is a Special Selection as described in cntycde1.xls?
    b. What is the authorization for a special selection in the defendants' case?
    c. Is the list of 2,200 persons (beauwhl.txt) a Special Selection?
    d. Is a Special Selection or the list of 2,200 persons (beauwhl.txt) what is described in the Plan for the Random Selection of Jurors as amended March 26, 2009, in Section 9c paragraph 2?
    e. How many times and when were special selections made as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, in Section 9c paragraph 2? Please provide a copy of the Order of the District Court directing the manner in which a special selection was to be made under Section 9 paragraph 2.
    f. How many times and when have Special Selections been made from 1997 to 2019?
        (1) Please provide copies of the Master Jury Wheels, Qualified Jury Wheels, resulting jury venires, and any additional materials used or created in each of these Special Selections.
        (2) If the 1997 to 2019 timeframe does not include at least the five Special Selections immediately preceding the Special Selection in Snarr/Garcia's cases, please additionally provide copies of the Master Jury Wheels, Qualified Jury Wheels, and resulting jury venires for those five Special Selections immediately preceding the Special Selection in Snarr/Garcia's case without limitation on the time period involved.

**D.**     **We would like to understand what Qualified Jury Wheel was used to select jurors in this case and how the eventual venire from which the petit jury selected was assembled**

15. What Qualified Jury Wheel was used to select petit jurors in this case?
16. Please provide a copy of the Qualified Jury Wheel from which the petit jury in the defendants' case was selected.
17. How was the Qualified Jury Wheel, used in the defendants' case to select a petit jury, assembled?
18. Please provide a copy of the qualification questionnaires of the Qualified Jury Wheel or any data from those questionnaires, including demographic data.
19. A list of 308 prospective petit jurors was generated in the defendants' case; how was this group of 308 people selected?

20. Please provide copies of data files, lists, explanations of interim steps, and juror qualification forms created, submitted, or used to draw the 308 people (presumably from the list of 2,200).

**E.    We would like to understand what source list was used for developing the Master Wheel from which the petit jury was selected in the defendants' case**

21. What was the source list used for the developing the Master Wheel from which the petit jury was selected for Snarr/Garcia's trial?
    a.  What is the list of 298,885 persons (VRL2010.txt) previously provided by your office and where did it come from?
    b.  Is the list of 298,885 persons (VRL2010.txt) a list of registered voters used to construct the Master Jury Wheel as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6?
    c.  What is the date on which the list of 298,885 persons (VRL2010.txt) was generated?
    d.  Is the list of 298,885 persons (VRL2010.txt) a list of registered voters following the federal general election in November 2008, as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6 paragraph 3?
        (1) If the list of 298,885 persons (VRL2010.txt) reflects the November 2008 federal general election, why does it include persons who turned 18 after November 2008 (up to 6/1/2009)?
    e.  Was this the same list used to select the grand jurors in this case? If not, what source list was used to select grand jurors in this case, and could you please provide a copy?

**F.    We would like to understand which jury plan and court orders controlled the assembly of the venire and jury selection for the defendants' grand jury and petit jury**

22. Can you please explain which jury plan and court orders controlled the assembly of the venire and jury selection for the defendants' grand jury and petit jury?
23. Is the Jury Plan for the Random Selection of Jurors as amended March 26, 2009, the plan used to summon jurors in this case? If not, please describe the Jury Plan used to summon jurors in this case and provide a copy.
24. Please provide a copy of the 1997 General Order for the process that is used by the Eastern District of Texas Clerk's Office to select the jury wheel, and explain how is it related to the 2009 Plan.

**G.    We would like to understand if the notice and reporting requirements set out in the JSSA and jury plan were followed in this case**

25. Was a general notice published and a notice published on the court's website setting out the process by which names were periodically and randomly drawn as

that process was employed for generating the Master Wheel from which the Snarr/Garcia jury venire was selected?

26. Is a report prepared as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6 paragraph 4?

27. Is there a report as described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6 paragraph 4 that applies to the Jury Wheel for Snarr/Garcia's case? If so, please provide a copy of that report.

28. Is the report described in the Plan for the Random Selection of Jurors as amended March 26, 2009, Section 6 paragraph 4 the Form AO-12?

**H.    We would like to understand and obtain copies of documents relevant to the selection of the grand jury in defendants' case**

29. Please identify and provide copies of the source list, Master Wheel, Qualified Wheel, venire and, if not constrained by grand jury secrecy, grand jury list for the grand jury that returned the indictment in defendants' case.

30. Please identify the source list from which the grand jury in the defendants' case was drawn.

31. Please identify the Master Wheel from which the grand jury in the defendants' case was drawn, provide a copy and describe the process of random selection used to generate the Master Wheel.

32. Please identify the Qualified Wheel from which the grand jury in the defendants' case was drawn, provide a copy and describe the process by which the Qualified Wheel was created.
    a. Please provide a copy of any demographic data relating to this qualified jury wheel, including demographic data from the qualification questionnaire.

33. Please identify the venire list from which the grand jury in the defendants' case was drawn.
    a. Please provide a copy of any demographic data relating to this venire, including demographic data from the qualification questionnaire.

34. Subject to any restriction arising from grand jury secrecy, please identify the grand jurors selected for the grand jury that returned the indictment in defendants' case.
    a. Please provide a copy of any demographic data relating to this grand jury, including demographic data from the qualification questionnaire.

35. Please provide a copy of all grand jury venires drawn from the same Master Wheel as the grand jury venire used in the defendants' case, including any available demographic data.

**I.    We would like to identify and obtain any demographic data you have for jurors on the Master Wheel, Qualified Wheel or venire for the defendants' grand jury and petit jury selection**

36. Could you please describe and provide demographic data that you have for the Master Wheel, Qualified Wheel and venire from which the defendants' grand jury and petit jury were selected, as well as demographic data for the grand and petit juries themselves? Demographic data should include, at a minimum, information relating to race, color, religion, sex, national origin, or economic status

37. Could we have the data files that include race and ethnicity (Hispanic or not) information for each person on the list of 2,200 people (beauwhl.txt as previously provided)?

38. Does the voter registration list used to construct Master Jury Wheels include racial information?

## IV.    Conclusion

If there are materials that are available only to be viewed in person, please identify these materials. Because travel is currently restricted and could be dangerous due to the Coronavirus global pandemic, we would very much appreciate it if all materials could be made available in digital format that could be transferred electronically.

If you have any questions about the documents and information I have requested, please email me at roblee@vcrrc.org or call me at 434-817-2970. I greatly appreciate your assistance with this matter.

Very Truly Yours,

_____/s/_____

Rob Lee
*Counsel for Mr. Snarr*

Christine Lehmann
Louisiana Capital Assistance Center
*Counsel for Mr. Garcia*

# Attachment 9

**EDGAR GARCIA V. UNITED STATES OF AMERICA, 1:13-CV-723**

**Declaration of Julia Chung**

1. I am an attorney licensed in the state of Louisiana and currently am an employee of the Louisiana Capital Assistance Center. In 2020 I was assisting Christine Lehmann, an attorney in the same office, in the representation of Edgar Garcia in his federal habeas proceeding. I have personal knowledge of the facts stated in this declaration.

2. On September 10, 2020, I called Chief Judge Rodney Gilstrap's office. I spoke to Andrea Brunson, his judicial assistant, and told her I was interested in all certificates prepared by Sutera Data Systems from years 2006 to 2012. I explained that, Sutera Data Systems, who was responsible for selecting names for the master jury wheels, was supposed to produce a certificate detailing its process and send it to the Chief Judge. Ms. Brunson was unfamiliar with the matter. She said she would call me back after she had more information.

3. On the same day, September 10, 2020, our office mailed a letter to Michael Sutera of Sutera Data Systems requesting that he supply the certificates prepared for each of the jury wheels developed for the Eastern District of Texas from 2006 to 2012.

4. On September 15, 2020, I spoke to Mr. Sutera regarding the certificate request letter our office sent. Mr. Sutera explained he usually signs the certificate and mails it, along with a report, back to the district court. Mr. Sutera said the certificates we were requesting go quite a ways back so he was unsure whether he had any copies of it in his file but that he would check. I told Mr. Sutera that based on the August 4, 2014 response we received from the Eastern District of Texas's clerk's office to our office's request for jury records, the clerk implied that Sutera Data Systems had the certificates. Mr. Sutera said he was aware that the clerk of court had suggested that he had the certificates and would call the clerk's office at the Eastern District of Texas to seek clarification.

5. On September 18, 2020, Ms. Brunson, judicial assistant for Chief Judge Rodney Gilstrap, called me back regarding the Sutera certificates. She told me that Beth Harper, a court clerk in the Eastern District of Texas, Beaumont Division, would have more information and suggested I contact Ms. Harper about our request. Ms. Brunson indicated that she had passed on my request to Ms. Harper.  As another attorney was already seeking the certificates from Ms. Harper I did not personally follow up with Ms. Harper.

6. On September 21, 2020, I contacted Mr. Sutera to follow-up with him regarding our request for certificates prepared for master jury wheels from 2006 to 2012. He said he did not have copies of the certificates on file and was waiting for the clerk from the Eastern District of Texas to call him back. Mr. Sutera said he could reproduce the certificates if needed.

7. On November 6, 2020, I emailed Mr. Sutera asking if he could reproduce certificates that were prepared for each of the master jury wheels developed for the Eastern District of Texas from 2006 to 2012. I did not receive a response.

8. On November 12, 2020, I called Mr. Sutera to follow-up on my request for certificates. Mr. Sutera stated he did not recall saying he could reproduce the certificates. Mr. Sutera said he did not have any records that went as far back as our request, from 2006 to 2012. He only had records until 2013. Mr. Sutera suggested I ask the Eastern District of Texas for records instead.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Julia Chung

January 10, 2023